COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Chief Judge Felton, Judges Humphreys and Kelsey
Argued at Alexandria, Virginia


PATRICIA TACKETT

v.      Record No. 1519-12-4

ARLINGTON COUNTY DEPARTMENT OF HUMAN SERVICES

DELORES O'BRIEN HEFFERNAN                        OPINION BY
                                          JUDGE ROBERT J. HUMPHREYS
v.      Record No. 1471-12-4                    AUGUST 13, 2013

ARLINGTON COUNTY DEPARTMENT OF HUMAN SERVICES

DELORES O'BRIEN HEFFERNAN

v.      Record No. 1520-12-4

ARLINGTON COUNTY DEPARTMENT OF HUMAN SERVICES[1]


FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
Benjamin N.A. Kendrick, Judge Designate

Deborah Kramer for appellant Patricia Tackett, Record No.
1519-12-4.

Elizabeth Tuomey (Tuomey Law Firm, PLLC, on briefs), for
appellant Delores O'Brien Heffernan, Record No. 1471-12-4.

Delores O'Brien Heffernan, *pro se*, Record No. 1520-12-4.

Jason L. McCandless; Karen M. Grane, Guardian *ad litem* for the
infant child (Office of the County Attorney; Karen Grane PLC, on
briefs), for appellee.

---

[1] Because the assignments of error are interrelated and because they share a common
factual background, we have consolidated these appeals for purposes of this opinion.

Patricia Tackett ("mother") and Delores O'Brien Heffernan ("grandmother") appeal the Arlington County Circuit Court ("circuit court") orders involuntarily terminating mother's residual parental rights regarding the minor child A.O., changing the permanency plan for A.O. to adoption, ordering no contact between the appellants and A.O. until A.O.'s eighteenth birthday, and denying counsel to A.O. in addition to her appointed guardian *ad litem*. Grandmother acting *pro se* also separately appeals the order denying her petition for custody of A.O. Arlington County Department of Human Services ("DHS") assigns cross-error in Record No. 1471-12-4 to the circuit court's determination that grandmother has standing to contest the termination of mother's parental rights.

## I.  BACKGROUND

On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court.  Richmond Dep't of Soc. Servs. v. Crawley, 47 Va. App. 572, 575, 625 S.E.2d 670, 671 (2006).  So viewed, the evidence established the following:

A.O. was born on September 16, 1999, to mother in Montgomery County, Maryland while mother was incarcerated.  The Circuit Court for Montgomery County granted grandmother temporary custody of A.O. when she was four days old and, on January 20, 2005, granted grandmother guardianship of A.O.  Grandmother was also the guardian of A.O.'s older sister, Samantha.  A.O. lived with grandmother from birth until removal by DHS.

Tammee Gaymon, an Arlington County Child Protective Services ("CPS") worker, first became aware of A.O. on February 11, 2009, when she interviewed grandmother regarding her alleged abandonment of Samantha.  Grandmother had been unemployed since June 2008, and was about to lose her apartment where she was living rent free.  Gaymon discussed housing options with grandmother and told her that if she did not secure housing, then A.O. could be

placed in foster care. Grandmother did not follow through with the housing services offered to her by DHS.

On February 19, 2009, Gaymon learned that grandmother withdrew A.O. from Arlington Science Focus School and was moving to Florida. Gaymon also learned of the family's previous contacts with Child Protective Services in Fairfax County, including two allegations that grandmother neglected Samantha. Concerned about A.O.'s safety, Gaymon requested an emergency removal order ("ERO") for A.O. on February 19, 2009. The Arlington County Juvenile and Domestic Relations District Court ("JDR court") issued the ERO and appointed Karen Grane as A.O.'s guardian *ad litem* ("GAL"). The next day, Gaymon went to grandmother's apartment, but no one answered the door. Neighbors reported that at times A.O. was home alone for extended periods and unsupervised for several hours in the apartment lobby during the school day.

The removal order remained outstanding. After trying to call and locate A.O. and grandmother, Gaymon reached grandmother on the phone on May 26, 2009. Gaymon informed grandmother that she needed to come to court to inform the judge of her whereabouts and plans for A.O. Grandmother stated that A.O. was in another jurisdiction and that Gaymon needed to close her case. Grandmother also said she had a condo in the area but refused to provide her address or provide A.O.'s location.

In July 2010, A.O. was caught shoplifting in Fairfax while with grandmother who was arrested for contributing to the delinquency of a minor. A.O. was removed from grandmother's custody and placed in foster care on July 22, 2010. Upon A.O.'s removal, mother was incarcerated for stealing grandmother's car after grandmother sought a protective order against her. Grandmother called Gaymon the night of A.O.'s removal. She said that she had been living in Fredericksburg for two and a half months and prior to that they stayed in a hotel somewhere in

Fredericksburg.  She also admitted to moving to Florida in February 2009, and said that A.O. was home schooled but she was not registered in a homeschool program because they were homeless.

DHS facilitated a Family Partnership Meeting (FPM) on July 27, 2010, which grandmother attended.  The JDR court held a five-day hearing on July 29, 2010, where grandmother was served with "ERO 7/26/10" in court.  The JDR court found that A.O. had not been in school and had not had stable housing since February 2009, and ordered that A.O. remain in foster care until the thirty-day hearing.  The thirty-day hearing occurred on August 19, 2010.  Although grandmother was notified of the court date, she did not attend.  The JDR court found that A.O. was abused or neglected, ordered DHS to file a foster care plan, and continued the case for a dispositional hearing.

Meanwhile, grandmother dropped the charge against mother regarding her car so mother could help get A.O. back from DHS.  DHS did not have contact with mother while she was incarcerated.  Upon her release from jail, mother went to DHS on September 14, 2010, and social worker Maurine Watkins began to work with her.  From her first visit to DHS, mother repeatedly stated that she was unable to care for A.O. because of a lack of housing and that she had no capacity or means to provide for A.O.  She also stated that her medical condition and back problems prevented her from being a placement option for A.O. and that she was in the process of getting herself together.  DHS did not seek to place A.O. with mother because of these representations and her extensive criminal and drug history.  Further, mother had not seen A.O. for a year prior to A.O.'s removal.  On two other occasions prior to removal, mother did not see A.O. for two or three years at a time.

On September 30, 2010, the JDR court ordered that the goal for A.O.'s placement was "return to own home," meaning with grandmother.  The JDR court approved the foster care

- 4 -

service plan dated September 1, 2010, and ordered that the "parents shall continue to utilize their best efforts to fulfill the requirements of the foster care plan approved herein and orders[ ] of the court entered herein." Grandmother and mother attended this dispositional hearing.

The foster care service plan noted that grandmother has a history of instability in housing and employment, poor judgment regarding the care of A.O., and a history of legal problems, including a charge of check fraud. The report also noted A.O.'s educational gaps due to frequent moves with grandmother—at the time of removal A.O. was ten years old and she had attended eleven different schools. The foster care service plan required the following of grandmother:

> 1) Complete a psychological evaluation and [follow] through with all recommended services. Target Date 4/2011
>
> 2) Secure stable housing and employment. Target Date 11/2010
>
> 3) Provide pertinent documents (i.e. lease agreement/closing papers) to verify permanent residence. Target Date 11/2010
>
> 4) Provide proof of employment/income (i.e. most recent pay stubs, W-2s, social security) to verify incoming finances. Target Date 01/2011
>
> 5) Communicate any changes in employment or housing status to DHS. Target Date – Ongoing
>
> 6) Complete a fingerprint based criminal history record check. Target Date 10/2010

Grandmother did not cooperate with DHS and failed to comply with the listed requirements of the plan. She inundated foster care workers with concerns, requests, faxes, and inaccurate assertions of her rights to raise A.O. without interference by DHS. She called DHS many times per week. On November 20, 2010, grandmother showed up at DHS unannounced, seeking to speak to the director. Tabitha Kelly, Child Welfare Bureau Chief, spoke with grandmother. Grandmother threatened to sue everyone in the Department. Kelly advised

grandmother to comply with the court orders, including the psychological evaluation. Grandmother spoke of her depression and how suicide rates go up around that particular time of year. These comments confirmed Kelly's understanding of grandmother's need for psychological testing to determine if she was healthy enough to care for A.O. Sherri Brothers, the foster care supervisor of A.O.'s case, also testified that grandmother's communications and behavior over time made clear to her that psychological testing of grandmother was necessary.

On December 9, 2010, grandmother called Brothers and stated that she was going to be testifying to members of Congress about the corruption in the family courts. On December 20, 2010, Watkins had a phone conversation with grandmother, again discussing the psychological evaluation and the required release form. On December 30, 2010, Brothers met with grandmother to discuss services necessary for her reunification with A.O. Grandmother expressed concerns about A.O. being drugged and stated that she had a retired military officer make a report to the FBI regarding A.O.'s safety in foster care.

At the beginning of 2011, grandmother had not completed the required psychological evaluation and had not submitted pay stubs to verify her employment as required by the foster care plan. In January 2011, grandmother refused to schedule a psychological evaluation because of her criminal case pending in Maryland and she said she may just have to accept the consequences from the court. On January 26, 2011, the JDR court ordered grandmother to complete the psychological evaluation within 30 days. DHS made another referral for her but grandmother did not participate. In February of 2011, Jason McCandless, the county attorney representing DHS, emailed grandmother reminding her that foster care review was approaching in March and reminding her of the documentation she must provide. McCandless again emailed grandmother on March 12, 2011 addressing her complaints and reminding her of what she must complete under the foster care service plan.

Following her removal from grandmother's custody, A.O. was placed in foster care with the Burka family where she did well. However, grandmother disrupted A.O.'s relationship with the Burkas. Grandmother refused to sign a form to get tutoring service for A.O. when she was struggling with her homework. After weekly phone visitation with grandmother, A.O. would be hostile towards the Burkas for a time. Grandmother would have inappropriate discussions with A.O., talking about A.O.'s case and asking if she was scared and really safe with the Burkas, and suggesting that grandmother could pick her up if necessary. These conversations were upsetting to A.O. Grandmother also called the police several times making unsubstantiated reports that A.O. was in danger with the Burkas. Based upon these reports, police showed up at the Burkas' home on at least three occasions at different hours of the day and night. When the Burkas and A.O. were staying in a Delaware hotel over the Christmas holidays, grandmother said she filed a report with the Attorney General's office in Delaware, claiming A.O. was being abused and asking police to investigate. The Burkas finally requested removal of A.O. from their care when grandmother showed up at a meeting in March 2011 with pictures of the Burka family at a sporting event taken unbeknownst to them. A.O. was upset and angry when she was told she would have to move from the Burkas. A.O. told grandmother during phone visitation that she was safe with the Burkas and did not want to move, and she blamed grandmother for making her move.

Dr. Stephanie Tebor, a clinical psychologist, tested A.O. in February 2011. She reported that A.O. has experienced trauma from early separation from her biological parents, moving from place to place, erratic school history, being a witness to shoplifting, and placement in foster care. She reported her expert opinion that A.O. has very limited insight into her behavior, actions, and consequences, she is confused, has trouble distinguishing reality from fantasy which

impairs her judgment, and she is under a lot of pressure from external sources, including grandmother and mother.

On March 24, 2011, six months after the JDR court ordered grandmother to comply with the foster care service plan, the parties appeared for a foster care review. At this point, grandmother still had not participated in the required psychological evaluation, submitting only a self-proclaimed "simple screen," signed by a doctor. DHS tried to get grandmother the required evaluation through the Multi-Cultural Center, until she missed so many appointments that the Center would no longer schedule one for her. DHS also told grandmother how she could schedule her own appointment with a doctor and encouraged her to use Dr. King; grandmother never cooperated with their efforts. Grandmother also made substantial amendments to the required release of information form, making it impossible for DHS to get any results had grandmother submitted to the psychological evaluation. However, DHS continued to request a permanency plan with goal of return to home to give grandmother additional opportunities to comply with the court orders. The JDR court again ordered grandmother to complete the psychological evaluation, sign the required release form, have stable housing and an educational plan, and be able to support A.O.

The JDR court noted in the March 24, 2011 order that "Mother does not request custody . . . and should not have unsupervised [visitation without] completing mental health evaluation and supports custody for her mother." Mother never completed a psychological evaluation or asked for help to get one. Mother supported grandmother having A.O., even though mother and grandmother have had a tumultuous relationship. Also in March 2011, mother told Wilson that she should have given all three of her children up for adoption. Brothers testified that DHS did not provide services to mother because she was not interested in being a potential custodian for A.O. DHS workers still communicated with mother about A.O. and invited her to some

- 8 -

meetings, and mother attended the court hearings. In the beginning, mother's involvement was too inconsistent for visitation and A.O. did not want contact with mother because she had been hurt by mother coming and going in her life. However, beginning in March 2011, mother had supervised visitation with A.O.

A.O. began living with the Burns foster family on March 19, 2011. A.O. told grandmother during visitation that she was happy in her placement and happy that she had a family. Mrs. Burns noticed that A.O. was fine when she did not have communication with mother and grandmother, but after communication with them A.O. became defiant, angry, and disrespectful to the Burnses. After Mrs. Burns recovered an unauthorized cell phone from A.O., A.O. eventually admitted that grandmother would come to school and give her cell phones. Sometimes A.O. would confide in Mrs. Burns. She told Mrs. Burns that she did not want to return to grandmother; she only wanted to live with mother, explaining that she did not get along with grandmother and did not like the things that happen when she is with her. During her time with Mrs. Burns, A.O. was consistent in this position.

In July 2011, DHS identified a new permanency goal of adoption for A.O. and requested termination of parental rights. On August 4, 2011, the JDR court approved the new foster care service plan and the goal of adoption. Grandmother was incarcerated on this date, but her guardian *ad litem* appeared in court for the hearing. Mother appeared at the August 4th hearing and for the first time requested custody of A.O. From September 2010, when mother first contacted DHS, to August 2011, mother never followed up with DHS to tell of her progress in getting her life together.

On December 7, 2011, the JDR court held a hearing regarding the termination of mother's parental rights. In a meeting with Brothers immediately before the termination hearing, mother stated that she was not in a position to provide care for A.O. and she was okay with A.O.

- 9 -

being adopted as long as she could still have contact with her. Mother advised Brothers that grandmother was too old to care for A.O. and that grandmother was "going crazy." As of the December 7, 2011 hearing, grandmother still had not provided DHS with proof of employment or employment income beyond personal checks, or participated in a court-approved psychological evaluation. The JDR court terminated the parental rights of mother and the biological father[2] and awarded custody of A.O. to the Department of Human Resources of Arlington County.[3]

A.O.'s disruptive and disrespectful behavior eventually led the Burnses to terminate their care of A.O. in February 2012. DHS then placed A.O. in a respite care home with the Campbell family. A.O. ran away from the Campbells' home and went with grandmother to Maryland where they lived for two weeks. Grandmother called James Manship, a leader from her church, to do a video "deposition" of A.O. that was later introduced as an exhibit in the subsequent court proceedings. In the video, grandmother, Manship, and George McDermott appear with A.O. and engage in a dialog of numerous accusations about the Arlington County courts, DHS, and the various foster care families who cared for A.O. Manship posted the video "deposition" along with other information about A.O.'s case on the internet.

In June 2012, DHS placed A.O. in a residential treatment center. Her program therapist identified A.O. as needing treatment for depression and mood stabilization, impaired social skills, and her history of abuse and family issues. Her history included sexual abuse, trauma of

---

[2] A.O.'s biological father was represented by counsel at the hearing terminating his parental rights. While he had notice of the hearing, he did not personally appear, and he did not appeal the JDR court order terminating his parental rights.

[3] At the December 7th hearing, mother was found in summary contempt of court for her repeated outbursts and interruption of the proceeding; the circuit court affirmed this finding and it is not part of the present appeal.

moving around, and not having a stable home, which she desires. However, A.O. identified her safe place as being with grandmother.

Both mother and grandmother appealed the termination of mother's parental rights to the circuit court. At a motions hearing on March 14, 2012, the circuit court denied DHS's motion to dismiss grandmother's appeal of the termination of mother's parental rights based on standing. The court found that "she has facial basis to be in this Court by having a [Maryland] custody order," and she comes into court "similarly situated to somebody who had filed their custody petition . . . ." Grandmother filed a petition for custody of A.O. in the JDR court on the same day. On April 5, 2012, the JDR court dismissed the petition, citing that all parental rights have been terminated and are on appeal to the circuit court and that grandmother's petition for custody should therefore be heard in circuit court along with the termination of parental rights case. Grandmother filed her appeal to circuit court on the same day. On June 8, 2012, the circuit court granted Grane's motion to consolidate grandmother's petition for custody case with the other cases, finding that they share common questions of law and fact and that no party's rights are prejudiced. The court also granted DHS a protective order for discovery to prevent further dissemination of A.O.'s personal information on the internet. Mother and grandmother filed motions for appointment of counsel for A.O., in addition to her guardian *ad litem*; the circuit court denied the motions. The five-day hearing began on June 20, 2012.

Twelve-year-old A.O. testified at the hearing, in the presence of mother and grandmother. She was asked to say what she wanted the court to hear. She said that she has a strong relationship with grandmother, and she has not been around mother much but has gotten to know her better through DHS visits and phone calls. She said the ideal place for her is with mother and grandmother. Contrary to her previous representations, she stated that she did not like anything about the Burkas or Burnses, except going to the movies with the Burnses. A.O. said

- 11 -

that she does not need guidance, just love, and that she has become more mature by "unbelievable standards." She believed that grandmother and mother have stable homes and can take care of her.

Testimony elicited from mother at the hearing included the following: Mother received $10,000, mostly in cash, when she gave another daughter up for adoption. She spent all the money in eight days. She bought a business, a truck, some shoes, and some crack cocaine. Mother has no health insurance, and her church pays for her medications. Mother has multiple convictions for petit larceny and a conviction for making false statements to the police. Mother recently pled guilty to prescription fraud in Fairfax County. She does not work now because she has no skills, and she has not looked for work in a year. She lives with her husband and oldest daughter, Samantha, who support her financially. She says she needs counseling. She continues to suffer from arteriovenous malformation and back pain. Mother said she has anger and hostility towards grandmother, that grandmother has manipulated her, and that grandmother has not given her guidance. Mother conceded on cross-examination that on January 17, 2012 she told McCandless, the attorney for DHS, that she could not take care of A.O. but that she also did not want A.O. to go with grandmother.

Regarding the permanency plan of adoption, the circuit court found that based upon the facts contained in the foster care plan and the testimony, "[r]easonable efforts to reunite the child with his or her parents are not required pursuant to Virginia Code § 16.1-281 B," and the permanency goal of adoption is achievable. Regarding termination of mother's parental rights, the court found that DHS met its burden of proving by clear and convincing evidence the requirements of Code § 16.1-283(C)(1) or (C)(2). In accordance with Code § 16.1-283(G), the circuit court also found that A.O. is not fourteen years old or older or otherwise of an age of discretion to exercise a veto over the placement decision. The court ordered no contact between

- 12 -

grandmother and A.O., and between mother and A.O., until A.O.'s eighteenth birthday, and

denied grandmother's petition for custody.

## II.  ANALYSIS

### A.  Termination of Mother's Parental Rights, Record No. 1519-12-4

#### 1.  Denial of Additional Counsel for A.O.

Mother and grandmother both argue that the circuit court erred in refusing to appoint an

attorney for A.O. contrary to Code § 16.1-266(E) and (F), as the wishes of the minor child were

in conflict with those of her guardian *ad litem*.

Code § 16.1-266(A) provides that,

> Prior to the hearing by the court of any case involving a child who
> is alleged to be abused or neglected or who is the subject of . . . a
> petition seeking termination of residual parental rights . . . the court
> shall appoint a discreet and competent attorney-at-law as guardian
> ad litem to represent the child pursuant to § 16.1-266.1.

Code § 16.1-266(E) states:

> In those cases described in subsections A, B, C and D, which *in the
> discretion of the court* require counsel *or* a guardian ad litem to
> represent the child or children or the parent or guardian or other
> adult party in addition to the representation provided in those
> subsections, a discreet and competent attorney-at-law *may be
> appointed by the court* as counsel or a guardian ad litem.

(Emphasis added).  Code § 16.1-266(F) states:  "In all other cases which *in the discretion of the

court* require counsel or a guardian ad litem, or both, to represent the child or children or the

parent or guardian, discreet and competent attorneys-at-law *may be appointed by the court*."

(Emphasis added).

Clearly any appointment of counsel in addition to a guardian *ad litem* is a matter left to

the sound discretion of the circuit court.  Here, the court heard oral argument on the mother's and

grandmother's motions to appoint counsel to A.O.  Neither mother nor grandmother has alleged

- 13 -

that A.O.'s guardian *ad litem*, Karen Grane, failed to comply with Supreme Court Rule 8:6. Rule 8:6 states that,

> When appointed for a child, the guardian ad litem shall vigorously represent the child, fully protecting the child's interest and welfare. The guardian ad litem shall advise the court of the wishes of the child in any case where the wishes of the child conflict with the opinion of the guardian ad litem as to what is in the child's interest and welfare.

Both mother's and grandmother's counsel concede that Grane disclosed A.O.'s desire to reunite with her family. Further, A.O. testified before the circuit court where she stated her wishes to live with mother or grandmother. Therefore, the circuit court was aware of A.O.'s wishes and did not abuse its discretion in denying court-appointed counsel to A.O. in addition to her court-appointed guardian *ad litem*.

Additionally, mother asserts on brief that the "due process rights accorded the minor child in abuse and neglect proceedings are reflected in Virginia's statutory scheme and in the Supreme Court Guardian ad-Litem guidelines" [sic]. She further stated that the court's decision "was a denial of the minor child's due process rights, as guaranteed by the Fourteenth Amendment" because A.O. was not able to participate in the legal proceedings. This is the extent of mother's due process argument, which she makes for the first time on appeal. Thus, mother's claim of constitutional error is procedurally barred pursuant to Rule 5A:18, "No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice." "The Court of Appeals will not consider an argument on appeal which was not presented to the trial court. Rule 5A:18 applies to bar even constitutional claims." Ohree v. Commonwealth, 26 Va. App. 299, 308, 494 S.E.2d 484, 488 (1998) (citation omitted). Mother gives no reason for this Court to invoke the good cause or ends of justice exceptions in Rule 5A:18. Thus, we will not address this due process argument.

- 14 -

2.  Age of Discretion of A.O.

Mother next argues that the circuit court

> abused [its] discretion and committed reversible error [when it] ruled that the minor child lacked the capacity, information, intelligence and judgment to exercise her veto power in the termination of her mother's and grandmother's parental rights. This ruling was erroneous in that the minor child demonstrated an understanding of the court process, understood that she might have a veto, was a strong advocate for herself, and was recognized by the court to have the capacity to make decisions about what church to attend.

Code § 16.1-283(G) states that "residual parental rights shall not be terminated if it is established that the child, if he is 14 years of age or older or otherwise of an age of discretion as determined by the court, objects to such termination." If the child is younger than fourteen,

> the determination of whether or not the child has reached an "age of discretion" is committed to the sound discretion of the trial court. However, if the evidence proves that a child is "sufficiently mature to have intelligent views and wishes on the subject" of the termination proceeding, then the trial court should conclude that a child who is younger than fourteen has reached the "age of discretion." When determining whether a child is mature enough to have intelligent views and wishes on the subject, the trial court should consider all of the circumstances, including the "capacity, information, intelligence, and judgment of the child." The trial court's determination will be reversed on appeal only for an abuse of discretion.

Hawks v. Dinwiddie Dep't of Soc. Servs., 25 Va. App. 247, 253, 487 S.E.2d 285, 288 (1997) (internal citations omitted). This Court said that the "focus of the inquiry is whether the child, regardless of how old he or she may be, is mature enough to intelligently consider the circumstances and ramifications of the termination proceeding." Id. at 255, 487 S.E.2d at 289.

When asked to consider whether A.O. was of an age of discretion, the circuit court stated,

> The Court does have a vivid recollection of the interaction that this Court saw with the questions that were posed to her. I watched her very carefully. And it's a shame, it's an absolute shame, that what she has been put through for the last 2 years by her mother, by her sister, by her grandmother, by Mr. Manship, and all these other

- 15 -

> problems that have been unnecessarily caused. It has affected her capacity, her information, her intelligence, and her judgment. It's this Court's belief that because of the interaction by her grandmother and others that she has, as some say, been "drinking the Kool-Aid." I think she's been manipulated. She does not have veto power as far as this Court is concerned, as she has not reached the age of discretion.

Evidence in the record supports the court's conclusion that A.O. has been manipulated and is not otherwise of an age of discretion. A.O. expressed sadness when she had to leave the Burka family. After a few months with the Burns family, A.O. reported in therapy that she enjoyed her time at her foster home and liked going on outings and trips with the Burns family, and liked their four dogs. In December 2011, after nine months with the Burns family, A.O. reported to her therapist that she liked her foster home placement and enjoyed living with the Burns. She reported a positive connection with her foster family, and expressed her desire to remain in the home because she felt stable. After she was removed from the Burns family, she shared with the therapist her hopes to return to the Burnses' home. A.O. also expressed to her therapist confusion and anger towards her biological family and did not understand her family's motivation to regain custody of her. A.O.'s anger was focused on mother and grandmother. However, A.O. testified at the hearing, in mother's and grandmother's presence, that she did not like anything about the Burkas or Burnses except going to the movies, and she wanted to live with mother or grandmother. A.O. also testified that at her age she did not need any guidance, only love, further demonstrating her lack of judgment.

In February 2011, sixteen months before the circuit court hearing, a clinical psychologist evaluated A.O. and noted that "her judgment and insight appeared impaired" and she "has retreated into a world of fantasy and escapism" and has resorted to lying as "an automatic self-protective mechanism." In August 2011, a therapist noted that A.O. "reports feeling torn between what her biological family tells her and what she feels." In February 2012, A.O.

reported that she behaves in a manner she thinks her biological family wants her to behave and she feels her family wants her to act out. The therapist concluded that A.O. was unable to make the connection that her behaviors lead to consequences.

Based on the above evidence, the circuit court did not abuse its discretion in finding that A.O. was not of an age of discretion to veto the termination of her mother's parental rights.

### 3. Sufficiency of the Evidence for Termination of Mother's Parental Rights

Mother's third assignment of error is that the circuit court

> abused its discretion [and] committed reversible error when it ruled that the mother failed to maintain continuing contact with and to substantially plan for the future of the minor child for a period of six months after the child's placement in foster care [notwithstanding] the reasonable and appropriate efforts of the social, medical[,] mental health and other rehabilitative agencies to communicate with the parent and to strengthen the parent/child relationship.

Mother's fourth assignment of error is that the circuit court

> abused its discretion [and] committed reversible error when it ruled that the mother had been unwilling or unable within a reasonable period of time not to exceed twelve (12) months from the time the child was placed in foster care to remedy substantially those conditions which led to the child's placement in foster care [notwithstanding] the reasonable and appropriate efforts of social, medical[,] mental health or other rehabilitative agencies.

We consider mother's third and fourth assignments of error together as the issues are closely related.

It was only necessary for the circuit court to find clear and convincing evidence that DHS met its burden of proof under *either* Code § 16.1-283(C)(1) *or* Code § 16.1-283(C)(2). Before residual parental rights can be terminated under Code § 16.1-283(C)(1), a court must find, based on clear and convincing evidence, that:

> The parent or parents have, without good cause, failed to maintain continuing contact with and to provide or substantially plan for the future of the child for a period of six months after the child's

- 17 -

> placement in foster care notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to communicate with the parent or parents and to strengthen the parent-child relationship.

Alternatively, under Code § 16.1-283(C)(2), a court must find that:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"When addressing matters concerning a child, including the termination of a parent's residual parental rights, the paramount consideration of a trial court is the child's best interests." Logan v. Fairfax Cnty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991). "The trial court's judgment, 'when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" Id. (quoting Peple v. Peple, 5 Va. App. 414, 422, 364 S.E.2d 232, 237 (1988)).

> "The preservation of the family, and in particular the parent-child relationship, is an important goal for not only the parents but also government itself. While it may be occasionally necessary to sever the legal relationship between parent and child, those circumstances are rare. Statutes terminating the legal relationship between parent and child should be interpreted consistently with the governmental objective of preserving, when possible, the parent-child relationship."

Lowe v. Dep't of Public Welfare, 231 Va. 277, 280, 343 S.E.2d 70, 72 (1986) (quoting Weaver v. Roanoke Dep't of Human Res., 220 Va. 921, 926, 265 S.E.2d 692, 695 (1980)).

Mother complains that DHS did not inform her about the emergency removal hearing or the thirty-day adjudicatory hearing, did not mail her copies of foster care plans, did not include her in the family partnership meetings, and did not begin her visitation with A.O. until six months after she initiated contact with DHS.

- 18 -

However, mother testified that on July 19, 2010, she and grandmother had an argument and grandmother called the police who arrested mother. As mother was sitting in the back of the police car, she told the police officer everything she could possibly tell her "to get my daughter away from my mother." She told the officer that the police were looking for A.O. and gave the name of the social worker, Gaymon, and by her own admission, mother was aware of A.O.'s removal. Mother was incarcerated for seventy-five days and released September 13, 2010. She was incarcerated at the time of the emergency removal hearing and at the thirty-day hearing, where the JDR court determined that A.O. had been abused or neglected. Although she left early, mother attended the September 30, 2010 dispositional hearing where the court approved the foster care plan on file for A.O., and the dispositional order states that the foster care plan was sent by the court to mother. Further, the only family partnership meeting in this case occurred on July 27, 2010, while mother was incarcerated. Therefore, mother's arguments concerning lack of notice and involvement are without merit.

As for visitation, mother was infrequently involved in A.O.'s case and in the beginning her involvement was too inconsistent for visitation, which began in March 2011. Further, A.O. did not want contact with mother at first because she had been hurt by mother coming and going in her life. Mother's position over and beyond the six-month time period after A.O. was placed in foster care, see Code § 16.1-283(C)(1), was that she was getting herself together, she was not able to care for A.O., and she supported A.O. living with grandmother. Therefore, the evidence supports the circuit court's finding that mother failed to maintain continuing contact with and substantially plan for the future of A.O. within the six months after A.O.'s placement in foster care.

Mother argues that her actions were not the cause of the child being placed into foster care and that she was stable, had a home, and was financially supported by her daughter and husband by the time of the hearing in circuit court in June 2012.

This Court has previously noted that the

> twelve-month time limit [in Code § 16.1-283(C)(2)] . . . was designed to prevent an indeterminate state of foster care "drift" and to encourage timeliness by the courts and social services in addressing the circumstances that resulted in the foster care placement. L.G. v. Amherst County DSS, 41 Va. App. 51, 56, 581 S.E.2d 886, 889 (2003). Within this "reasonable period" time frame, the various supportive and rehabilitative agencies must use "reasonable and appropriate efforts" to assist the parent in remedying those conditions. Code § 16.1-283(C)(2). "If the parent fails to substantially remedy those conditions within twelve months the court may act to prevent the child from lingering in foster care." L.G., 41 Va. App. at 57, 581 S.E.2d at 889.

Akers v. Fauquier Cnty. Dep't of Soc. Servs., 44 Va. App. 247, 256-57, 604 S.E.2d 737, 741 (2004).

While arguably it was grandmother's immediate actions that led to A.O.'s foster care placement, mother's position that she could not take A.O. certainly contributed to A.O.'s continued placement in foster care, as mother maintained that she was unable to take A.O. until she petitioned for custody of A.O. *thirteen months* after A.O. was placed in foster care. Even after she petitioned for custody, she represented several times that she could not care for A.O. and wavered on whether or not she wanted A.O. to live with grandmother. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Kaywood v. Halifax Cnty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990). While mother testified that she had housing and the financial support of her husband at the time of the circuit court hearing, as of January 2012 she still represented that she could not take care of A.O. Therefore,

- 20 -

the circuit court did not abuse its discretion in finding that mother was unwilling or unable to remedy the circumstances that led to A.O.'s placement in foster care.

Mother further complains that the evidence does not support the circuit court's determination (1) that the efforts extended by DHS to strengthen the parent-child relationship were reasonable and appropriate, and (2) that the services offered to mother were reasonable. DHS did not offer many services to mother; the record only supports that a psychological evaluation was recommended to her and scheduled, but she did not submit to the evaluation. While DHS communicated with mother to an extent and facilitated supervised visitation with A.O., DHS did not provide further services to mother because of her stated position that she was not a placement option for A.O.

> The statutory language contained in Code § 16.1-283(C)(1) requires "reasonable and appropriate" efforts to be made to provide services. We must interpret the statutory mandate in accordance with the language chosen by the legislature. *"Reasonable and appropriate" efforts can only be judged with reference to the circumstances of a particular case. Thus, a court must determine what constitutes reasonable and appropriate efforts given the facts before the court.*

Ferguson v. Stafford Cnty. Dep't of Soc. Servs., 14 Va. App. 333, 338, 417 S.E.2d 1, 7 (1992) (emphasis added).

In Harris v. Lynchburg Div. of Soc. Servs., 223 Va. 235, 288 S.E.2d 410 (1982), the father was not offered any services, because DSS maintained that he never contacted it or requested any assistance, and failed, without good cause, to communicate with the children for twelve months or failed to make reasonable progress under the foster care plan to eliminate the conditions that led to the children's foster care placement. The Supreme Court assumed that DSS made out a prima facie case for termination of father's parental rights, and then stated that where there is "undisputed evidence that a parent has not been offered or provided services, the prima facie case is overcome, and the party moving for termination is put to the burden of

- 21 -

proving the factors listed in § 16.1-283(C)(2).  And in the absence of such proof, reversal of a

termination order is required."  Id. at 243, 288 S.E.2d at 414.  The Court added, "This is not to

say that the Division must force its services upon an unwilling or disinterested parent.  But that is

not the situation here; because Woodson was not offered any services, we have no way of

knowing whether he would have been willing or interested."  Id. at 243-44, 288 S.E.2d at 415.

This case is easily distinguished from Harris because in Harris, the father had no contact

with DSS, while in this case mother contacted DHS and made known her position that she was

not a placement option for A.O.  As our Supreme Court stated, DHS is not required to force its

services upon an unwilling or disinterested parent.  Id. at 243, 288 S.E.2d at 415.  Further,

mother was offered a referral for a psychological evaluation in order to have unsupervised

visitation with A.O., but mother did not complete the evaluation.  It was reasonable for DHS to

not provide further efforts or services for mother based on her inconsistent involvement and

consistent representation that she was not a placement option.  Therefore, the circuit court did

not abuse its discretion in finding that DHS extended (1) reasonable and appropriate efforts to

communicate with mother and to strengthen the parent-child relationship, and (2) reasonable and

appropriate efforts to remedy the conditions that led to or required A.O.'s continuation in foster

care as it related to mother.

4. Due Process Claims

Mother's final assignment of error is that the circuit court's

> failure to provide the mother with notice of emergency removal
> hearing, notice of adjudicatory hearing, failure to appoint a
> guardian ad litem for her while she was incarcerated, act of
> permitting her attorney to withdraw prior to hearing terminating
> her parental rights and denying her motion for a continuance was a
> denial of her constitutional right to due process.

Mother did not argue before the circuit court that any of the above actions were a denial

of her constitutional rights; thus, she makes this argument for the first time on appeal.  Mother

argues in her reply brief that she "implicitly" argued below that she was denied due process. However, the record reflects no mention of the deprivation of any constitutional right or due process in mother's argument in the circuit court.

Rule 5A:18 is clear that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling . . . ." "'Rule 5A:18 applies to bar even constitutional claims.'" Stokes v. Commonwealth, 61 Va. App. 388, 396, 736 S.E.2d 330, 335 (2013) (quoting Farnsworth v. Commonwealth, 43 Va. App. 490, 500, 599 S.E.2d 482, 487 (2004)). "As such, even due process claims will not be considered for the first time on appeal." Id. The purpose of Rule 5A:18 is to "'allow correction of an error if possible during trial, thereby avoiding the necessity of mistrials and reversals.'" Id. at 397, 736 S.E.2d at 335 (quoting Gardner v. Commonwealth, 3 Va. App. 418, 423, 350 S.E.2d 229, 232 (1986)). "By failing to raise this argument to the trial court, appellant deprived the trial court of the opportunity to consider whether his procedural due process rights were violated." Id. Mother did not request appellate review under either the good cause or ends of justice exceptions in Rule 5A:18, and therefore we will not address mother's fifth assignment of error as it is procedurally defaulted.

B. Grandmother's Appeal of the Termination of Mother's Parental Rights, Record No. 1471-12-4

### 1. Grandmother's Standing to Contest the Issue

Because it determines whether we may address several of grandmother's assignments of error, we first address the cross-error assigned by DHS. DHS argues that the circuit court erred in determining that grandmother "has standing to contest the termination of the residual parental rights of the biological mother." Issues of standing are questions of law that this Court reviews *de novo*. Kelley v. Stamos, 285 Va. 68, 73, 737 S.E.2d 218, 220 (2013). "The general requirements of standing have often been stated: 'The purpose of requiring standing is to make

certain that a party who asserts a particular position has the legal right to do so and that his rights will be affected by the disposition of the case.'" Id. (quoting Goldman v. Landsidle, 262 Va. 364, 371, 552 S.E.2d 67, 71 (2001)). Simply put, "one cannot raise third party rights." DePriest v. Commonwealth, 33 Va. App. 754, 761, 537 S.E.2d 1, 4 (2000). Exceptions to the standing rule only apply to certain challenges under the First Amendment, and where "'individuals not parties to a particular suit stand to lose by its outcome and yet have no effective avenue of preserving their rights themselves.'" Tucek v. Commonwealth, 44 Va. App. 613, 617 n.3, 606 S.E.2d 537, 539 n.3 (2004) (quoting DePriest, 33 Va. App. at 762, 537 S.E.2d at 4).

Grandmother did not have any legal right to assert that mother's parental rights should not be terminated. Parental rights to A.O. only belonged to mother and the biological father. Grandmother had not adopted A.O. Grandmother was not the parent possessing the right to the child or the child affected by the parent's rights. See Wright v. Alexandria Div. of Soc. Servs., 16 Va. App. 821, 433 S.E.2d 500 (1993) (child had standing to raise violation of mother's constitutional rights in a termination of parental rights case). Further, grandmother had an effective avenue for preserving her custody of A.O., which was to file a petition for custody as she did on March 14, 2012. We hold that the circuit court erred in finding that grandmother had standing to challenge the termination of mother's parental rights. Consequently, as grandmother lacked standing to assert mother's parental rights in the circuit court, it follows that she also lacks such standing to challenge the judgment of the circuit court in three of her assignments of error on appeal relating to mother's parental rights, namely, that the circuit court erred in finding "that there was clear and convincing evidence that termination of [mother's] residual parental rights was in the best interests of [A.O.]"; "that there was clear and convincing evidence to support termination of [mother's] residual parental rights, satisfying the statutory factors listed in Virginia Code § 16.1-283(C1) and (C2)"; and "that [A.O.] was not otherwise at an age of

- 24 -

discretion [to object to the termination of mother's parental rights], under Virginia Code § 16.1-283(G)." Grandmother only has standing to appeal the circuit court's findings made in connection with the change in permanency goal and with regard to grandmother's petition for custody.

## 2. Grandmother's Guardianship

Grandmother argues that the circuit court "erred in approving the goal of adoption for [A.O.] because [grandmother] is [A.O.'s] legal guardian." Grandmother argues that her guardianship of A.O. is a distinct concept from custody. She asserts that "no order of the Trial Court transferred, terminated, or otherwise ended [grandmother's] guardianship," as no court order includes the word "guardianship," and because grandmother's Maryland guardianship order remains effective, her consent is required before A.O. can legally be adopted.[4] We disagree.

Virginia JDR and circuit courts have subject matter jurisdiction to determine the custody, control, or disposition of a child within its jurisdiction alleged to be abused or neglected or where the termination of residual parental rights is sought. See Code §§ 16.1-241(A) and 16.1-244. If a child is found to be abused or neglected, Code § 16.1-278.2 allows for a JDR court to order transfer of legal custody to a local board of social services and terminate the rights of the parent

---

[4] The Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), codified in Virginia as Code § 20-146.1, et seq., addresses child custody determinations and proceedings, including proceedings for abuse, neglect, guardianship, and termination of parental rights. Code § 20-146.1. The parties did not brief or argue in this Court the impact of the UCCJEA on the ability of the circuit court to terminate mother's parental rights or grandmother's guardianship. Moreover, it appears that prior to entry of the final orders of the circuit court, the Circuit Court for Montgomery County, Maryland determined that it did not have jurisdiction over A.O. and recognized Virginia's authority over the matter, citing A.O.'s legal residence in Virginia, the lawful return of A.O. to Arlington County Child Protective Services as her custodian after she was missing with grandmother in Maryland, and grandmother's participation in the multiday hearing in Arlington County Circuit Court. Thus we need not and do not address either the application or the impact of the UCCJEA on the termination of mother's parental rights and, by extension, on grandmother's guardianship.

pursuant to Code § 16.1-283. We have said that the "General Assembly contemplated that once a trial court terminated a person's parental rights, the next step was to determine who would have custody of the child." Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 196, 717 S.E.2d 811, 817 (2011). "Any order terminating residual parental rights shall be accompanied by an order continuing or granting custody to a local board of social services, to a licensed child-placing agency or the granting of custody or guardianship to a relative or other interested individual . . . ." Code § 16.1-283. See also Code § 16.1-244 (Virginia circuit courts have jurisdiction to determine the custody or guardianship of a child when custody or guardianship is incidental to the determination of causes pending in such courts.). We also note that under Maryland law a guardianship decree may be set aside or modified by a court having jurisdiction over the custody or guardianship of the child, In re Arlene G., 483 A.2d 39, 42 (Md. 1984), and grandmother does not contest the circuit court's jurisdiction on appeal.

We hold that grandmother's foreign guardianship ended by operation of Virginia law once mother's parental rights were terminated. The order terminating mother's parental rights effectively set aside grandmother's guardianship, when the circuit court, having considered grandmother's care of A.O., determined that it is in A.O.'s best interest to be in the custody of DHS and placed for adoption with the consent of DHS, pursuant to Code § 16.1-283. Because grandmother's guardianship terminated concurrently with mother's parental rights, it follows that grandmother's consent is not required to place A.O. for adoption.

### 3. Change in Permanency Goal

Grandmother's second assignment of error is that the circuit court "erred in finding that there was a preponderance of the evidence to support approval of the goal of adoption for [A.O.]."

"When addressing matters concerning a child, including the termination of a parent's residual parental rights, the paramount consideration of a trial court is the child's best interest." Logan, 13 Va. App. at 128, 409 S.E.2d at 463. "'In matters of a child's welfare, trial courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests.'" Id. (quoting Farley v. Farley, 9 Va. App. 326, 328, 387 S.E.2d 794, 795 (1990)). The circuit court's judgment will not be disturbed on appeal unless plainly wrong or without evidence to support it. Id. "A preponderance-of-the-evidence standard governs judicial review of the foster care plan recommendations . . . ." Najera v. Chesapeake Div. of Soc. Servs., 48 Va. App. 237, 240, 629 S.E.2d 721, 722 (2006).

Code § 16.1-282.1 provides that,

> a permanency planning hearing shall be held within 11 months of the dispositional hearing at which the foster care plan . . . was reviewed if the child . . . (b) is under the legal custody of a local board of social services . . . and has not had a petition to terminate parental rights filed on the child's behalf . . . . The board or child welfare agency shall file a petition for a permanency planning hearing within 10 months of the dispositional hearing at which the foster care plan was reviewed pursuant to § 16.1-281. The purpose of this hearing is to establish a permanent goal for the child and either to achieve the permanent goal or to defer such action through the approval of an interim plan for the child.

In this case the dispositional hearing was held on September 30, 2010, where the JDR court ordered that the goal for A.O.'s placement was "return to own home," (meaning with grandmother). The court approved the September 2010 foster care plan, and ordered that the "parents shall continue to utilize their best efforts to fulfill the requirements of the foster care plan approved herein and orders[ ] of the court entered herein." The plan required grandmother to complete a psychological evaluation and follow through with all recommended services by April 2011, secure stable housing and employment by November 2010, provide pertinent

- 27 -

documents to verify permanent residence by November 2010, and provide proof of employment and income to verify incoming finances by January 2011.

In July 2011, DHS identified the new permanency goal of adoption for A.O. and requested termination of parental rights. On August 4, 2011 the JDR court approved a new foster care plan and the goal of adoption. As of August 4, 2011, grandmother had not completed the psychological evaluation required by the court, or followed through with any services that might have been recommended as a result of the evaluation. Grandmother had only completed a self-proclaimed "simple screen" of her mental health, which was not in compliance with the court order. Grandmother's need for a psychological evaluation was evident to the social workers involved, based on her behavior and communications with them and A.O. At one point grandmother had secured housing which a social worker visited in March 2011, but at the time of the August 4th hearing she was in jail and she did not maintain residence at the previously visited home. Grandmother had not provided sufficient proof of employment or verification of her income beyond two personal checks. Foster parents testified that A.O. became upset and confused and her behavior worsened after communicating with grandmother. Grandmother was very uncooperative with the efforts of DHS and focused more on fighting with DHS than on complying with the court orders to get A.O. back. Grandmother had a history with DHS regarding neglect of her older granddaughter, Samantha. At times grandmother, Samantha, and A.O. were homeless and lived in a car. Prior to removal, A.O. had very inconsistent schooling, attending eleven different schools and at times no school at all while in grandmother's custody.

"Virginia law recognizes the 'maxim that, sometimes, the most reliable way to gauge a person's future actions is to examine those of his past.'" Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 267-68, 616 S.E.2d 765, 770 (2005) (quoting Petry v. Petry, 41 Va. App. 782, 793, 589 S.E.2d 458, 463 (2003)). This maxim certainly applies in grandmother's case regarding

A.O. as she failed to comply with the foster care service plan to improve her circumstances to take care of A.O., and she demonstrated failure to properly care for A.O. in the past. The evidence in the record before us supports that the circuit court's order changing the goal from return home to adoption was in the best interest of A.O.

4. No Contact Order

Grandmother's sixth assignment of error is that the circuit court "erred in granting a No Contact order, as such order is not in the best interests of [A.O.], is contrary to her expressed wishes, and is unduly broad in its terms."

When addressing matters concerning a child, the paramount consideration of a court is the child's best interests. Logan, 13 Va. App. at 128, 409 S.E.2d at 463. A circuit court is vested with broad discretion in making decisions to foster a child's best interests, and on appellate review a circuit court is presumed to have made its determination based on the child's best interests. Id. The circuit court's judgment will not be disturbed on appeal unless plainly wrong or without evidence to support it. Id.

The circuit court ordered grandmother and mother to have no contact with A.O. until A.O.'s eighteenth birthday without the prior express written permission of DHS. Evidence in the record supports that no contact with grandmother is in A.O.'s best interests. When A.O. did not have communication with grandmother, A.O. was improving and doing well in foster care. When A.O. did have contact with grandmother, she became defiant, disrespectful, and rude. Grandmother would confuse and upset A.O. A.O.'s therapist noted in February 2012 that A.O. behaves in a manner she thinks her family wants her to behave and A.O. acknowledged that she feels her family would want her to act out. Grandmother consistently worked to sabotage the efforts of DHS designed to improve A.O.'s well-being. Grandmother initiated unauthorized contact with A.O. at school and provided her with unauthorized cell phones. She also took A.O.

away from her lawful custodian, DHS, for two weeks.  This evidence clearly supports the circuit court's finding that the no contact order as it relates to grandmother is in A.O.'s best interest.

### 5.  Failure to Appoint Counsel for A.O.

Grandmother's seventh assignment of error is that the circuit court "erred in refusing to appoint an attorney for [A.O.]"  We affirm the circuit court's judgment on this assignment of error for the reasons stated in subsection (A)(1), *supra*.

### C.  Grandmother's Petition for Custody, Case No. 1520-12-4

### 1.  Rule 5A:18

In grandmother's *pro se* petition for custody appeal, she alleges a number of errors in the circuit court to which she never made specific objections on the pages she cited as preserving the issues.  Rule 5A:18, cited *supra*, "requires a litigant to make timely and specific objections, so that the trial court has 'an opportunity to rule intelligently on the issues presented, thus avoiding unnecessary appeals and reversals.'"  Brown v. Commonwealth, 279 Va. 210, 217, 688 S.E.2d 185, 189 (2010) (quoting West v. Commonwealth, 43 Va. App. 327, 337, 597 S.E.2d 274, 278 (2004)).  Because grandmother did not raise her objections before the circuit court, as required by Rule 5A:18, we cannot consider the following assignments of error on appeal:

> Before hearing evidence from *pro se* Appellant, the Trial Court called her unfit, including observing, without any basis, that she could not take care of herself and, in violation of federal law, that she was too old.

> Without hearing any evidence presented at Circuit Court trial [sic] to support it, the Trial Court accused [A.O.] of being guilty of stealing.

> The Trial Court allowed testimony in violation of attorney-client privilege and clergy-client privilege, even though *pro se* Appellant did not waive those privileges.

[T]he Trial Court [c]onsidered factors not allowed to be considered under Virginia and Federal law in denying custody of [A.O.] to her legal guardian, *pro se* Appellant, including economic hardship.

[T]he Trial Court [e]ntered an order that was arbitrary and capricious and procedurally defective, in that it did not set forth any findings of facts or clearly cite to any findings of fact to support denial of custody to *pro se* Appellant.

[T]he Trial Court [f]ailed to find that [*pro se*] Appellant had met all of the statutory requirements for the granting of custody of [A.O.] to *pro se* Appellant in response to her 2012 Petition for Custody, and ignored evidence that she had steady income from social security and a job, obtained a psychological evaluation that was not found by any court to be unsatisfactory, and had a home to live in.

2. Rule 5A:20

Grandmother acting *pro se* also asserts several assignments of error for which she provides no principles of law or authority to support her argument. Rule 5A:20 requires an appellant to support her argument with law or authority: "The opening brief of appellant shall contain: . . . (e) The standard of review and the argument (including principles of law and authorities) relating to each assignment of error." An argument amounting to no more than an assertion that the circuit court's action was contrary to the law or the evidence is inadequate and constitutes a waiver of that issue. Andrews v. Commonwealth, 280 Va. 231, 252, 699 S.E.2d 237, 249 (2010) (applying Rule 5:27(d) which requires that opening briefs before the Supreme Court contain the "standard of review, the argument, and the authorities relating to each assignment of error"). In Stokes v. Commonwealth, 49 Va. App. 401, 410, 641 S.E.2d 780, 784 (2007), this Court declined to address appellant's contention because she cited no authority for her assertion. Likewise, we will not consider the following unsupported arguments on appeal:

[The circuit court erred in] [r]esting [ ] its subject matter jurisdiction ruling on the JDR court's findings on subject matter

jurisdiction and without having heard any testimony or evidence that could [support] its ruling.

[The circuit court] showed extensive bias against *pro se* Appellant, as evidenced by automatically sustaining Arlington DHS's and the GAL's objections to questions asked by *pro se* Appellant without allowing her to explain why the objections should not be granted, while, in contrast, allowing such opportunity when Arlington DHS counsel or the GAL were asking questions.

[The circuit court erred in] [t]hreatening *pro se* Appellant with contempt and jail for exercising her right to object to numerous irregularities at the trial.

*Pro se* Appellant was prevented from seeing witnesses when they testified during the hearing and the court refused to make accommodation to allow *pro se* Appellant to see the witnesses when they testified.

Appellant was denied full opportunity to make objections because she was threatened with jail [ ] if she made objections.

   3.  The Merits of Grandmother's Remaining Assignments of Error

Grandmother first alleges that the circuit court erred in failing to hear the case *de novo* and showed extreme prejudice towards her and A.O. by reading as its findings of fact the affidavit of Sherri Brothers that accompanied DHS's petition for termination of parental rights in the JDR court.  Grandmother includes several subparts to support this assignment of error.  Grandmother argues that the circuit court erred when it "ignored evidence presented at the June 2012 *de novo* circuit court trial, by reading word-for-word from the September 8, 2011 Brothers JDR Affidavit as his 'findings of fact.'"

Grandmother attempts to analogize to <u>Alexander v. Flowers</u>, 51 Va. App. 404, 414, 658 S.E.2d 355, 359 (2008), where this Court reversed the circuit court for denying the mother a trial *de novo* by reading the trial transcripts from the JDR court.  That is not the case here, where the circuit court found persuasive and read from an affidavit that was actually entered into evidence and was thus properly before the court for consideration with the other evidence in the case.

- 32 -

While DHS filed the affidavit in the JDR court, it also became a part of Exhibit 1 for DHS in the case before the circuit court. The circuit court did as grandmother claims and read almost the entire affidavit prior to announcing its ruling terminating mother's parental rights. While Brothers did not adopt the affidavit as her testimony when she testified, the exhibit was admitted into evidence without objection by grandmother during the testimony of the first witness, Tammee Gaymon.

If a litigant sits by and does not timely object to the admission of evidence, he or she waives the objection and the fact-finder has the right and duty to "'consider it along with all the evidence and give it such weight as they think it is entitled to.'" Bitar v. Rahman, 272 Va. 130, 141, 630 S.E.2d 319, 325 (2006) (quoting TransiLift Equip., Ltd. v. Cunningham, 234 Va. 84, 91-92, 360 S.E.2d 183, 187-88 (1987)). When introducing Exhibit 1, DHS announced that it was a compilation of orders from the JDR court, "up to and including the affidavits for termination." No party objected to this exhibit when DHS introduced it or at the conclusion of Brothers' testimony, so the circuit court was free to consider the affidavit as evidence. Therefore, the circuit court did not err in reading the affidavit as part of its findings of fact.

Grandmother also argues that the circuit court erred when it "allowed testimony on the basis of evidence that was not disclosed to *pro se* Appellant in discovery." There is no evidence in the record before us that grandmother requested discovery. If grandmother desired discovery, she "had the obligation to file an appropriate motion with the trial court, rather than waiting until the morning of trial to object to the admission of any evidence." Rappold v. Indiana Lumbermens Mut. Ins. Co., 246 Va. 10, 14, 431 S.E.2d 302, 305 (1993). While the circuit court issued a protective order governing discovery material in the termination of parental rights case, there is no evidence that grandmother applied for a modification of the protective order for good cause, as provided in paragraph 10 of the order. Instead, she stated on brief that it was

impossible for her to do her own discovery because the petition for custody case was consolidated with the termination of parental rights case only twelve days before the hearing began. Considering that she did not request discovery, this argument that evidence was not disclosed to her in discovery is without merit.

Grandmother next alleges several sub-assignments of error to support her broad assertions that the circuit court "denied the right to a fair trial, and violated due process rights, as provided for by the Court's rules, guaranteed by the US Constitution, and showed extreme prejudice." Grandmother argues that

> [b]ecause of the premature consolidation of the [petition for custody] case with the already ongoing [termination of parental rights] cases, [p]ro [s]e Appellant was denied the opportunity to do discovery and call her own witnesses in the [petition for custody] [c]ase, and was prohibited from fully reviewing and making copies of discovery used by the other parties in the [termination of parental rights] case.

Grandmother filed her petition for custody in the JDR court on March 14, 2012. On April 5, 2012, the JDR court dismissed her petition and included in the order, "This case should be heard in Circuit Court with the termination of parental rights case." Grandmother filed her notice of appeal in the circuit court on the same day. On June 8, the circuit court consolidated the custody case with the termination of parental rights case, set to be heard on June 20.

There is no evidence that grandmother attempted to subpoena any witnesses who were not able to attend the hearing because the date was set for June 20. The record is silent as to what evidence grandmother expected to obtain in discovery, and there is no evidence that she even requested discovery from DHS. She did not file a motion to modify the protective order on discovery material in the termination of parental rights case related to her custody case, and she did not ask the circuit court to allow expedited discovery under Rule 4:9(b)(ii) ("The court may allow a shorter or longer time."). Thus, grandmother fails to demonstrate how the decision to

- 34 -

consolidate the cases for hearing on June 20, 2012 actually prejudiced her case.  Absent a showing of prejudice, we find no abuse in the circuit court's discretion to consolidate the cases.  See Tazewell Oil Co. v. United Virginia Bank/Crestar Bank, 243 Va. 94, 112, 413 S.E.2d 611, 621 (1992) (finding no abuse in the court's discretion to deny discovery absent a showing of prejudice).

Grandmother next argues that the circuit court erred when it "[a]llowed introduction of documents that were hidden from *pro se* Appellant and without giving her an opportunity to review and object to them."  The only document grandmother complains of in the record is Exhibit 1 for DHS, discussed *supra*.  Although grandmother claims that she "promptly objected to the introduction of Exhibit 1," the record actually reflects that grandmother did not object to the admission of Exhibit 1 when DHS introduced it.  She only objected when the circuit court read from the termination of parental rights affidavit just prior to announcing its decision after five days of hearing evidence and argument.  Grandmother did not ask to see the exhibit until the court began to read the affidavit.  Upon her objection, her counsel for the termination of parental rights matter immediately shared the affidavit with grandmother.  Before the court even finished reading the affidavit, grandmother interrupted and offered her rebuttal to the affidavit, which she had prepared and filed when the affidavit was submitted to the JDR court in December 2011.  Grandmother's "rebuttal" is an eighteen-page document addressing each point made in the affidavit.  Thus, in addition to her objection not being timely, grandmother clearly had actually seen the document she objected to on the basis that it was hidden from her.

Grandmother's claim that she did not know Exhibit 1 contained the affidavit is incredible because upon introducing Exhibit 1, counsel for DHS proffered without contradiction that it was "a compilation of orders from the Juvenile Court, all of the relevant orders for the proceedings that led to the termination, up to and including the affidavits for termination.  And I have marked

that as County Exhibit Number 1." Grandmother had the opportunity to object or ask to view the exhibit when the court asked, "Any objection?" To which grandmother did not respond. The circuit court therefore did not err in admitting County Exhibit 1.

Finally, grandmother asserts several sub-assignments of error in support of her argument that the "[circuit court] erred in denying [*pro se*] Appellant's Petition for Custody of [A.O.]"

Grandmother argues that the circuit court "failed to find the necessary facts to support that *pro se* Appellant was unqualified to have custody of [A.O.] based on the standards in the statute and rules of the Commonwealth applied to the facts presented by witnesses at trial."

> On review *"a trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination on the child's best interests."* [Farley, 9 Va. App. at 329, 387 S.E.2d at 796]. Furthermore, the *evidence is viewed in the light most favorable to the prevailing party below* and its evidence is afforded all reasonable inferences fairly deducible therefrom. . . . The trial court's judgment, "when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it." [Peple, 5 Va. App. at 422, 364 S.E.2d at 237].

Logan, 13 Va. App. at 128, 409 S.E.2d at 463 (emphasis added). When the circuit court acts as the fact-finder, it has the responsibility of weighing the credibility of the witness and determining the weight to be given to her testimony. Anderson v. Commonwealth, 282 Va. 457, 464, 717 S.E.2d 623, 626 (2011). In order to transfer custody of a child to a relative, Code § 16.1-283(A1) requires a court to find, based on a preponderance of the evidence, that the relative is qualified to receive and care for the child and is committed to providing a permanent, suitable home for the child, among other things.

The circuit court properly denied grandmother's custody petition for the same reasons that it approved the goal of adoption. As discussed *supra*, grandmother failed to comply with the services required for reunification, all of which were aimed at improving her care of A.O. In the past grandmother had not provided a stable home for A.O., by moving frequently and being

homeless at times.  She also had not ensured consistent schooling for A.O.  The record also indicates that A.O.'s behavior deteriorated with grandmother's influence.

The circuit court clearly found that grandmother had no credibility:

> This Court has listened to the testimony of [grandmother] very carefully . . . .  This Court has seen her to be [ ] aggressive, hostile, angry, indignant at times, and out of control.  She appears to be unstable and out of touch with reality at times.  She seems to be more concerned with fighting DHS than what is in the best interest of this child.

Thus, the circuit court did not believe grandmother's assertions of her ability to care for A.O. This Court is bound by the credibility findings of the circuit court.  Denise v. Tencer, 46 Va. App. 372, 397, 617 S.E.2d 413, 426 (2005).  Evidence in the record supports the circuit court's decision to deny grandmother's petition for custody, and we will not disturb the ruling on appeal.

CONCLUSION

For the foregoing reasons, we affirm the judgments of the circuit court in each of these appeals.

Record No. 1519-12-4, affirmed.

Record No. 1471-12-4, affirmed.

Record No. 1520-12-4, affirmed.