COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Humphreys, Petty and Chafin
Argued at Lexington, Virginia


JANETTE CAMPBELL AND
  WESSELL CAMPBELL


v.      Record No. 0882-16-3


LYNCHBURG DEPARTMENT OF
  SOCIAL SERVICES


JANETTE CAMPBELL AND
  WESSELL CAMPBELL


v.      Record No. 1401-16-3                          MEMORANDUM OPINION[*] BY
                                                       JUDGE TERESA M. CHAFIN
LYNCHBURG DEPARTMENT OF                                    MARCH 14, 2017
  SOCIAL SERVICES


JANETTE CAMPBELL AND
  WESSELL CAMPBELL


v.      Record No. 1402-16-3


LYNCHBURG DEPARTMENT OF
  SOCIAL SERVICES


JANETTE CAMPBELL AND
  WESSELL CAMPBELL


v.      Record No. 1403-16-3


LYNCHBURG DEPARTMENT OF
  SOCIAL SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF LYNCHBURG
J. Leyburn Mosby, Jr., Judge Designate

Katina C. Whitfield for appellants.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

George A. Somerville; Killis T. Howard, Guardian *ad litem* for the minor children (Eleanor A. Putnam Dunn; Harman, Claytor, Corrigan & Wellman; Killis T. Howard, P.C.; City of Lynchburg Attorneys' Office, on brief), for appellee.

On April 29, 2016, the Circuit Court of the City of Lynchburg dismissed the custody petitions filed by Janette and Wessell Campbell pertaining to their four grandchildren. On appeal, the Campbells contend that the circuit court erred by dismissing their custody petitions based on the factors set forth in Code §§ 16.1-282.1(A1) and 16.1-283(A1). For the reasons that follow, we affirm the circuit court's decision.

## I. BACKGROUND

"When reviewing a [circuit] court's decision on appeal, we view the evidence in the light most favorable to the prevailing party, granting it the benefit of any reasonable inferences." Boatright v. Wise Cty. Dep't of Soc. Servs., 64 Va. App. 71, 76, 764 S.E.2d 724, 727 (2014) (quoting Congdon v. Congdon, 40 Va. App. 255, 258, 578 S.E.2d 833, 835 (2003)). So viewed, the evidence is as follows.

On May 3, 2012, four siblings, E.C., J.C., N.J.1, and N.J.2, were removed from their parental home by the Lynchburg Department of Social Services ("LDSS") following allegations of abuse and neglect. At the time of their removal, E.C. was six years old, J.C. was four years old, and N.J.1 and N.J.2 were both four months old. The children were placed in foster care following their removal.

Janette and Wessell Campbell are these children's maternal grandparents.[1] They were not present when the children were removed from their parental home, and they did not contribute to the circumstances that led to their removal. Although the Campbells owned a

---

[1] On March 25, 2016, the date of the last hearing in the circuit court, Janette Campbell was sixty-six years old and Wessell Campbell was seventy-four years old.

house in Lynchburg, they lived in Miami, Florida at the time of the children's removal. They continued to live in Miami at all times pertinent to this case.

When the Campbells learned that their grandchildren had been removed from their parental home by LDSS, they travelled to Lynchburg to make themselves available as custodians for the children. The Campbells filed a series of petitions seeking custody of their grandchildren in May 2012 and November 2013. They also visited their grandchildren while they were in foster care.

Janette Campbell visited the children twelve times between May and August 2012. Amy Witt, the children's foster care worker, was present at these visits. She described the visits as "very chaotic." She explained that Mrs. Campbell had difficulty managing her time between the children and feeding N.J.1 and N.J.2. Wessell Campbell visited the children twice between May and August 2012. Witt testified that Mr. Campbell "basically just [sat] on the couch" during the visits and that he did not significantly interact with the children.

Mrs. Campbell returned to Miami in August 2012, but she visited the children in Lynchburg on December 11, 2012, and January 8, 2013. Witt testified that Mrs. Campbell did not "engage very much," or significantly interact with the children on the December 11 visit. On the January 8 visit, Witt left the children in the care of Mrs. Campbell when she was meeting with the children's parents in an office across the hall. Mrs. Campbell was unable to meet the needs of the children. The children constantly screamed throughout the visit, and Witt and the children's parents eventually stopped their meeting to assist Mrs. Campbell. Witt testified that Mrs. Campbell became "very upset" when she intervened in the visit and that she gathered her belongings and walked out of the room. Mrs. Campbell has not visited N.J.1 or N.J.2 since the January 8, 2013 visit.

On December 11, 2013, the Juvenile and Domestic Relations District Court of the City of Lynchburg dismissed the Campbells' custody petitions based on unfavorable reports filed by the State of Florida pursuant to the Interstate Compact on the Placement of Children ("ICPC"). These reports indicated that the Campbells' income was not adequate to support the children and that a relative who lived with the Campbells had failed to submit to a criminal background screening process. The Campbells appealed the decision to the circuit court.

The Campbells attempted to remedy the issues addressed in the adverse ICPC report while their appeal was pending. Mrs. Campbell obtained employment as a teacher to supplement her family's income. The Campbells also became licensed foster care parents, and enrolled in a program to become licensed therapeutic foster care parents. Additionally, the relative who failed to submit to the criminal background screening required by the ICPC investigation was deported following a domestic violence incident involving his girlfriend.

Mr. Campbell continued to visit his grandchildren in Lynchburg. Although Mr. Campbell did not visit N.J.1 or N.J.2 in 2013, he visited them three times in 2014 and four times in 2015. Each of these visits lasted approximately one hour. The children's foster care providers were present at the 2014 and 2015 visits. During these visits, Mr. Campbell often talked on his cell phone or to the foster care providers rather than the children. Mr. Campbell fell asleep for approximately thirty minutes during one visit. At another visit held at a fast-food restaurant, Mr. Campbell was found in the women's restroom. He was largely absent for the majority of that visit, spending time in the restroom, his truck, and a nearby retail store. Although Mrs. Campbell spoke with N.J.1 and N.J.2 on the telephone on one occasion, the Campbells did not have any additional contact with the children beyond Mr. Campbell's visits in 2014 and 2015.

On April 30, 2015, the circuit court held an initial hearing on the Campbells' appeal. Proceeding *pro se*, the Campbells testified that they were qualified to care for their grandchildren and that they wished for the children to live with them in Miami. Mrs. Campbell testified about her employment, income, and educational background.[2] She explained that she had experience working with children with special needs through her career in education. She also described the Campbells' home in Miami and the resources that would be available to the children there. Although Mrs. Campbell admitted that she had not visited N.J.1 and N.J.2 since January 2013, she explained that she could not visit the children because she was searching for employment and that her husband visited them on her behalf. Following the hearing, the circuit court ordered a new ICPC investigation and continued the case for further proceedings.

On March 23, 2016, the State of Florida filed a new ICPC report after reinvestigating the Campbells and their residence in Miami. The new ICPC report did not recommend placement of E.C. and J.C. with the Campbells because the children required therapeutic foster care. Although the ICPC report approved the placement of N.J.1 and N.J.2 with the Campbells, the author of the report expressly questioned whether such a placement would be in the best interests of the children. The author noted that N.J.1 and N.J.2 had been in their current foster care placement since they were five months old and that they had bonded with their foster family. The author also expressed concerns over the infrequent contact between the children and the Campbells and Mr. Campbell's limited interaction with the children.

The circuit court held a second hearing in this matter on March 25, 2016. As the children's parents had appealed a decision from the juvenile and domestic relations district court terminating their parental rights regarding the children, their counsel appeared at the hearing.

---

[2] Mrs. Campbell testified that she had a Ph.D. in psychology, a master's degree in education, and a "doctorate" degree in biblical studies and religious education.

Although the parents appealed the district court's termination decision, they supported the Campbells' custody petitions.

As a preliminary matter, counsel for the parents requested a continuance of the case based on the conclusion of the ICPC report. Counsel noted that the ICPC report did not approve placement of E.C. and J.C. with the Campbells because the children required therapeutic foster care. Counsel then explained that the Campbells were currently enrolled in a program to become certified therapeutic foster care providers and that they would complete the program in approximately three weeks. Counsel requested the circuit court to continue the case to allow the Campbells to complete the program and be reevaluated as a therapeutic foster care placement.

The circuit court denied the motion, noting that the case had been pending for nearly four years. After the circuit court denied the motion, counsel for LDSS informed the circuit court that "the parties all understand that legally we cannot consider transferring custody of [E.C. and J.C.] . . . without the approved [ICPC] home study." The circuit court agreed, and the parties agreed to only proceed on the petitions pertaining to N.J.1 and N.J.2. Accordingly, no further evidence was presented concerning the custody petitions pertaining to E.C. and J.C.

The Campbells testified consistently with their testimony from the April 30, 2015 hearing. They reiterated their desire to obtain custody of N.J.1 and N.J.2. Notably, Mr. and Mrs. Campbell each expressly testified that he or she satisfied the factors regarding the placement of children with relatives set forth in Code §§ 16.1-282.1(A1) and 16.1-283(A1). Additionally, Mrs. Campbell testified that she was earning more money in a new job and that her daughter had moved in with her to assist in the care of the children.[3] When asked about the children's special needs, however, Mrs. Campbell testified that N.J.1 had "a reflux" and that N.J.2 "has nothing that I know of, nothing." Like Mrs. Campbell, Mr. Campbell testified that

---

[3] This daughter was not the biological mother of the children.

N.J.1 had "acid reflux." He then stated that N.J.2 also had the same condition and that "she doesn't seem to need attention."

LDSS then presented evidence establishing the sporadic visitation between N.J.1 and N.J.2 and the Campbells, and the events that occurred during their visits. LDSS also presented evidence concerning the special needs of the children. Don Wilhelm, a licensed clinical social worker, testified as an expert in "attachment[,] trauma[,] and emotional needs of abused and neglected children." Wilhelm had previously completed a psychological assessment of N.J.1 and N.J.2. Based on his assessment, Wilhelm concluded that N.J.1 was "essentially healthy," but that she had issues with anxiety and hypervigilance attributed to her early developmental trauma. Wilhelm opined that these issues could be corrected over time with adequate parental attention.

Wilhelm diagnosed N.J.2 with reactive attachment disorder. He described reactive attachment disorder as a "really significant diagnosis" that would have both short-term and long-term effects on N.J.2. Wilhelm explained that N.J.2 would require therapeutic intervention and therapeutic parenting in order to develop healthy social relationships. In his written assessment admitted into evidence, Wilhelm explained that N.J.2 needed "motivated" parents who were "capable of dealing with a challenging and difficult child."

Wilhelm also testified that N.J.1 and N.J.2 had developed secure attachments with their foster care providers. Due to the limited contact between the Campbells and their grandchildren, Wilhelm stated that the Campbells were "psychological strangers" to N.J.1 and N.J.2. Wilhelm opined that removing N.J.1 and N.J.2 "from their secure attachment caregivers would be a tremendous psychological loss [that would be] devastating to [the] kids." He also predicted that N.J.2 would "panic" if she was placed in the care of the Campbells and that her negative behaviors would increase due to a psychological regression triggered by the change of custody.

At the conclusion of the evidence, the circuit court dismissed the Campbells' custody petitions pertaining to N.J.1 and N.J.2. While the circuit court noted that the Campbells could be "good parents" for the children, it concluded that a change in custody was not in their best interests. The children's parents agreed to voluntarily relinquish their parental rights regarding all of the children following the circuit court's decision.

The circuit court memorialized its decision in an order entered on April 29, 2016. In pertinent part, that order stated that the circuit court was "unable to make the findings necessary to transfer the custody of any of the [c]hildren to a relative as required by [Code §§] 16.1-282.1(A1) and 16.1-283(A1)." The order then dismissed the Campbells' custody petitions pertaining to all of their grandchildren, and dispensed with their signatures pursuant to Rule 1:13. These appeals followed.

## II. ANALYSIS

On appeal, the Campbells argue that the circuit court erred by dismissing their custody petitions. They contend that the evidence established that they satisfied the four factors set forth in Code §§ 16.1-282.1(A1) and 16.1-283(A1).[4] They further contend that a transfer of custody was in the best interests of their grandchildren. Upon review, we conclude that the Campbells have waived their appellate challenge to the circuit court's decision regarding the custody of E.C. and J.C. We also conclude that the evidence presented supported the circuit court's decision pertaining to the custody of N.J.1 and N.J.2.

---

[4] Despite their own suggestion to the contrary, we conclude that the Campbells preserved this argument for appellate review. The Campbells expressly testified that they satisfied each of the four statutory requirements set forth in Code §§ 16.1-282.1(A1) and 16.1-283(A1), and the circuit court found that they had established a *prima facie* case supporting their custody petitions regarding N.J.1 and N.J.2. Furthermore, counsel for the children's parents argued that the Campbells had satisfied these requirements. Accordingly, we find that the Campbells presented this issue to the circuit court as it pertained to the petitions regarding N.J.1 and N.J.2, and therefore, they did not waive this issue.

## A. THE CAMPBELLS WAIVED THEIR CHALLENGE TO THE CIRCUIT COURT'S DECISION REGARDING THE CUSTODY OF E.C. AND J.C.

In the present case, the Campbells' assignment of error is not limited to the circuit court's decision pertaining to the custody of N.J.1 and N.J.2. Rather, their assignment of error alleges that the circuit court erred by dismissing the custody petitions pertaining to *all* of the children. The Campbells, however, failed to object to the circuit court's decision to dismiss their petitions pertaining to E.C. and J.C., or present any argument challenging its reasons for doing so.

Rule 5A:18 states, in pertinent part, "No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice." The purpose of Rule 5A:18 is to provide courts with "'an opportunity to rule intelligently on the issues presented,'" and thereby correct any potential errors at trial and avoid "'unnecessary appeals and reversals.'" Tackett v. Arlington Cty. Dep't of Hum. Servs., 62 Va. App. 296, 332, 746 S.E.2d 509, 527 (2013) (quoting Brown v. Commonwealth, 279 Va. 210, 217, 688 S.E.2d 185, 189 (2010)). Pursuant to Rule 5A:18, we "will not consider an argument on appeal which was not presented to the trial court." Id. at 315, 746 S.E.2d at 519 (quoting Ohree v. Commonwealth, 26 Va. App. 299, 308, 494 S.E.2d 484, 488 (1998)).

The circuit court dismissed the Campbells' custody petitions pertaining to E.C. and J.C. because the second ICPC home study did not approve placement of the children with them. The Campbells did not object to this decision, or argue that the circuit court's decision was incorrect.[5] In fact, the record implies that the Campbells agreed with the decision. When counsel for LDSS informed the circuit court that "the parties all understand that legally we cannot consider transferring custody of [E.C. and J.C.] . . . without the approved [ICPC] home study," the

---

[5] The Campbells also did not object to the circuit court's decision to deny the motion for a continuance made on behalf of the children's parents, or assign error to that decision on appeal.

Campbells did not object to that representation. Furthermore, the Campbells only proceeded on the petitions pertaining to N.J.1 and N.J.2 at the March 25, 2016 hearing. Neither the Campbells nor any other party presented evidence specifically pertaining to E.C. or J.C.

Under these circumstances, we conclude that the Campbells waived any appellate argument concerning the circuit court's decision regarding the custody of E.C. and J.C. Accordingly, we refuse to address the substance of the Campbells' assignment of error to the extent that it challenges the circuit court's decision to dismiss their petitions pertaining to those children. Furthermore, we find no reason to invoke the good cause or ends of justice exceptions to Rule 5A:18 to address this issue.[6] See Edwards v. Commonwealth, 41 Va. App. 752, 761, 589 S.E.2d 444, 448 (2003) (*en banc*).

## B. THE CIRCUIT COURT DID NOT ERR BY DISMISSING THE CAMPBELLS' CUSTODY PETITIONS PERTAINING TO N.J.1 AND N.J.2

"When addressing matters concerning a child, . . . the paramount consideration of a trial court is the child's best interest." Tackett, 62 Va. App. at 328, 746 S.E.2d at 525 (quoting Logan v. Fairfax Cty. Dep't of Hum. Servs., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991)). "In matters of a child's welfare, trial courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests." Id. "On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Fields v. Dinwiddie Cty. Dep't

---

[6] While we do not address the Campbells' substantive argument regarding the circuit court's decision pertaining to E.C. and J.C., we note that Code § 63.2-1000, the Virginia statute adopting the Interstate Compact on the Placement of Children, states that a

> child shall not be sent, brought or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child.

of Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656, 659 (2005) (quoting Farley v. Farley, 9

Va. App. 326, 329, 387 S.E.2d 794, 796 (1990)).  When the circuit court's decision is based on

*ore tenus* evidence, the decision "will not be disturbed on appeal unless plainly wrong or without

evidence to support it."  Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 266, 616

S.E.2d 765, 769 (2005) (quoting Fields, 46 Va. App. at 7, 614 S.E.2d at 659).

In order for a court to transfer custody of a child who has been placed in foster care to a

relative, it must conclude that the relative satisfies the factors set forth in Code

§ 16.1-282.1(A1).[7]  In pertinent part, that statute states:

> Any order transferring custody of the child to a relative other than
> the child's prior family shall be entered only upon a finding, based
> upon a preponderance of the evidence, that the relative is one who,
> after an investigation as directed by the court,
>
> (i)  is found by the court to be willing and qualified to receive and
> care for the child;
>
> (ii)  is willing to have a positive, continuous relationship with the
> child;
>
> (iii)  is committed to providing a permanent, suitable home for the
> child; and

---

[7] We note that the circuit court dismissed the Campbells' custody petitions based on Code §§ 16.1-282.1(A1) and 16.1-283(A1).  Although Code § 16.1-283(A1) applies to custody transfers that occur upon the termination of the parental rights of a child's parents, the factors set forth in that subsection of the statute are identical to those set forth in Code § 16.1-282.1(A1).  The only difference in these subsections of the statutes is that Code § 16.1-283(A1) allows a transfer of custody to a relative or "other interested individual," whereas Code § 16.1-282.1(A1) only pertains to custody transfers to relatives.  The circuit court's reference to both statutes is understandable when viewed with the fact that it was initially proceeding on the parents' appeal of the involuntary termination of their parental rights as well as the Campbells' custody petitions.

We also note that the Campbells argue that a transfer of custody was in the best interests of the children pursuant to Code §§ 20-124.2 and 20-124.3.  In order for the circuit court to transfer custody, however, the Campbells had to satisfy the factors set forth in Code §§ 16.1-282.1(A1) and 16.1-283(A1).  "[O]nce the foster care statutory process has commenced, [a] court may not transfer custody of a child to a relative, other than the child's prior family, without making the four specific findings of fact required by . . . the foster care statutes." Lynchburg Div. of Soc. Servs. v. Cook, 276 Va. 465, 479-80, 666 S.E.2d 361, 368 (2008).

> (iv) is willing and has the ability to protect the child from abuse
> and neglect . . . .

Code § 16.1-282.1(A1); see also Code § 16.1-283(A1) (setting forth the same requirements in the context of custody transfers upon the termination of the parental rights of a child's parents).

In the present case, the Campbells testified that they satisfied each of the requirements set forth in Code §§ 16.1-282.1(A1) and 16.1-283(A1). "When the circuit court acts as the fact-finder, it has the responsibility of weighing the credibility of the witness[es] and determining the weight to be given to [their] testimony." Tackett, 62 Va. App. at 338, 746 S.E.2d at 530. "[T]he credibility of witnesses and the weight to be accorded their testimony is a matter exclusively within the province of the trier of fact." Yopp v. Hodges, 43 Va. App. 427, 439, 598 S.E.2d 760, 766 (2004). When the circuit court considered the Campbells' testimony along with the other evidence presented in this case, it rejected their testimony and concluded that they did not satisfy the factors set forth in Code §§ 16.1-282.1(A1) and 16.1-283(A1). This decision was supported by the evidence.

The evidence presented in this case established that the Campbells failed to satisfy at least two of the factors set forth in Code §§ 16.1-282.1(A1) and 16.1-283(A1). Specifically, the Campbells failed to satisfy factors (i) and (ii) of those statutes. Based on the evidence, the circuit court did not err by concluding that the Campbells were not: (1) willing and qualified to receive and care for N.J.1 and N.J.2, and (2) willing to have a positive, continuous relationship with them.

The evidence presented in this case strongly suggested that the Campbells were unqualified to meet the needs of N.J.1 and N.J.2. Both of the children have significant special needs related to their earlier abuse and neglect. N.J.1 has issues with anxiety and hypervigilance that will require increased parental attention. N.J.2 has more significant issues. She has been diagnosed with reactive attachment disorder, a significant diagnosis that will require therapeutic

intervention and therapeutic parenting. Wilhelm opined that her needs would place increased demands on her caregivers and that more therapeutic intervention would be required if a custody change occurred because she would "panic" and "regress."

The Campbells' testimony established that they were unaware of the children's special needs and how to effectively address them. When asked about the special needs of the children, Mrs. Campbell testified that N.J.1 had acid reflux and that N.J.2 did not have any special needs. Mr. Campbell testified similarly, stating that both N.J.1 and N.J.2 had acid reflux and that N.J.2 "doesn't seem to need attention." Although N.J.2's diagnosis of reactive attachment disorder was stated in the cover letter of the second ICPC report, neither Mrs. Campbell nor Mr. Campbell mentioned this significant diagnosis. Contrary to Mr. Campbell's testimony, Wilhelm testified that N.J.2 would need substantial attention to address her condition and allow her to develop into a healthy adult.

Moreover, we note that the few visits that Mr. and Mrs. Campbell had with N.J.1 and N.J.2 went poorly. Mrs. Campbell had difficulty managing her time between the children, and her final visit required the intervention of the children's parents and LDSS employees. Mrs. Campbell became frustrated at the visit and left the building, and she has not seen the children since that day. Mr. Campbell was inattentive to the children's needs at several visits, and he failed to significantly interact with them. The problems encountered by the Campbells at their visits with N.J.1 and N.J.2 implied that they were unqualified to meet their significant special needs.

The evidence presented in this case also indicated that the Campbells were not willing to have a continuous relationship with the children. While the Campbells expressed a desire to obtain custody of N.J.1 and N.J.2, they refused to take the steps required to integrate themselves into the children's lives. Although the Campbells owned a house in Lynchburg and they

travelled to the area on multiple occasions to attend court proceedings, they failed to regularly visit N.J.1 and N.J.2. As a result, they have been described as "psychological strangers" to the children, and they are unaware of their needs and unqualified to care for them.

LDSS and the children's foster care providers encouraged the Campbells to visit N.J.1 and N.J.2. and have contact with them. Despite this encouragement, Mrs. Campbell has not seen the children since 2013 and Mr. Campbell only visited them seven times in a three-year period. With the exception of one phone call between Mrs. Campbell and the children, the Campbells have not communicated with N.J.1 or N.J.2 through phone calls, letters, birthday cards, or any other method. In total, the Campbells have spent approximately seven hours with N.J.1 and N.J.2 since 2013.

> Virginia law recognizes the "maxim that, sometimes, the most reliable way to gauge a person's future actions is to examine those of his past." Petry v. Petry, 41 Va. App. 782, 793, 589 S.E.2d 458, 463 (2003). "As many courts have observed, one permissible 'measure of a parent's future potential is undoubtedly revealed in the parent's past behavior with the child.'" Id. (citation omitted). . . . [P]ast actions and relationships over a meaningful period serve as good indicators of what the future may be expected to hold." Winfield v. Urquhart, 25 Va. App. 688, 696-97, 492 S.E.2d 464, 467 (1997) (citations omitted).

Toms, 46 Va. App. at 267-68, 616 S.E.2d at 770.

Although the Campbells had the ability to visit N.J.1 and N.J.2 and they were encouraged to do so, they failed to establish a relationship with the children. This failure implied that the Campbells were not likely to maintain a continuous relationship with N.J.1 and N.J.2 in the future.

In summary, we conclude that the evidence presented in this case supported the circuit court's decision to dismiss the Campbells' custody petitions pertaining to N.J.1 and N.J.2. The evidence established that the Campbells were unqualified to care for the children and uncommitted to maintaining a continuous relationship with them. Therefore, the circuit court did

- 14 -

not err by determining that the Campbells failed to satisfy the requirements of Code §§ 16.1-282.1(A1) and 16.1-283(A1) and dismissing their custody petitions on that basis.

## III.  CONCLUSION

For the reasons stated, we affirm the circuit court's decision.

<u>Affirmed.</u>