COURT OF APPEALS OF VIRGINIA

Present: Judges Petty, AtLee and Senior Judge Clements

SONYA BROWN KING

v.      Record No. 0179-18-2

KING GEORGE DEPARTMENT
OF SOCIAL SERVICES

MEMORANDUM OPINION*
PER CURIAM
AUGUST 14, 2018

FROM THE CIRCUIT COURT OF KING GEORGE COUNTY
Herbert M. Hewitt, Judge

(Melissa Lynch Freeman, on brief), for appellant.

(Nicholas A. Pappas; Kristie L. Kane, Guardian *ad litem* for the
minor children, on brief), for appellee.

Sonya Brown King (mother) appeals the orders terminating her parental rights to her

children. Mother argues that the circuit court erred by finding that (1) the evidence was sufficient to

terminate her parental rights under Code § 16.1-283(C); and (2) the termination of mother's parental

rights was in the children's best interests.[1] Upon reviewing the record and briefs of the parties, we

conclude that this appeal is without merit. Accordingly, we summarily affirm the decision of the

circuit court. See Rule 5A:27.

BACKGROUND

"On appeal, 'we view the evidence and all reasonable inferences in the light most

favorable to the prevailing party below, in this case the Department.'" Farrell v. Warren Cty.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] The King George Department of Social Services argues that mother did not preserve her arguments for appeal because she endorsed the final order as "Seen and objected to." However, we find that mother preserved her arguments for appeal in her closing argument and motion to reconsider. See Lee v. Lee, 12 Va. App. 512, 515, 404 S.E.2d 736, 738 (1991) (*en banc*).

Dep't of Soc. Servs., 59 Va. App. 375, 386, 719 S.E.2d 329, 334 (2012) (quoting Jenkins v. Winchester Dep't of Soc. Servs., 12 Va. App. 1178, 1180, 409 S.E.2d 16, 18 (1991)).

Mother and Jason William King, Sr. (father) are the biological parents to six children, five of whom are the subject of this appeal.[2] On November 16, 2011, while mother was at a doctor's appointment, father was home with four of the children, who ranged in age from eight months to four years old. Three of the children were outside playing. The eight-month-old child needed her diaper changed, so father, who had a "weak stomach," placed the child in the bathtub to clean her bottom. The phone rang, and father left the child in the bathtub with enough water "to splash" while he answered the phone. While he was on the phone, the three-year-old child came into the house and turned the water back on in the bathtub where the eight-month-old child was sitting. Father did not hear the child turn on the water, and when he returned to the bathroom, the eight-month-old child was floating in about a foot of water. He tried to revive the child, but she had passed away. As a result of the incident, the Department became involved and found this to be a Level 1 case of physical neglect. Father was arrested and convicted of involuntary manslaughter. The circuit court also convicted father of two misdemeanors of contributing to the delinquency of a minor. The circuit court sentenced father to a total of ten years and twenty-four months in prison, with nine years and eighteen months suspended.

The Department remained involved with the family over the years. In April 2013, while father was incarcerated, mother entered into a temporary entrustment agreement with the Department. Mother had a "short inpatient stay at Snowden." The Department placed the children in temporary foster care for five days, and subsequently, the children were returned to the home. Mother explained that at the time, she had postpartum depression after the birth of her last child,

_____

[2] Mother has another child, who is no longer a minor and whose biological father is not Jason King.

- 2 -

depression over the loss of the eight-month-old child, and stress from raising the children alone while father was incarcerated.

By September 2015, mother had a "severe . . . narcotic dependency" and stole money and possessions from the household to purchase drugs. Mother admitted that she abused Percocet and other painkillers that were prescribed by doctors. Father obtained a protective order against mother, and father received possession of the home. Mother was not allowed to have contact with the children or father. Mother admitted herself into Snowden, and then lived at Empower House and Thurman Brisben Homeless Shelter in September and October 2015.

Also, in September 2015, the Department received a complaint alleging that father was abusive toward the children. On October 23, 2015, the Department conducted a family partnership meeting and developed an action plan.[3] After investigating the matter, the Department found that there was no evidence to prove that father was physically abusing the children. However, the Department concluded that the family scored "very high risk" on the Risk Assessment and provided ongoing services to the family.

Although the protective order later was dismissed, mother did not return to the home. She lived in other locations in November and December 2015 and did not see the children. She admitted that she was too angry at father to return home and see the children. Mother was convicted of driving under the influence and possession of a scheduled narcotic. She was incarcerated from February 2, 2016 until April 17, 2016.

The children's guardian *ad litem* filed a CHINS petition, and on March 22, 2016, the Department removed the children from the home and placed them in foster care.[4] The children

---

[3] Mother was not aware of the meetings between the Department and father in October and November 2015 and March 2016.

[4] The Department investigated several relatives with whom to place the children. The paternal grandmother was the only relative who expressed an interest in having the children live

were determined to be at risk of being abused or neglected. The school had made several reports about the children's clothing and appearance and father's unwillingness to seek medical attention for the children. Mother was incarcerated at the time of the removal and admitted at the CHINS hearing that she thought it would be best for the children to go into foster care.

Once the children were in foster care, the Department required mother to complete a parenting class, complete a parenting and psychological assessment, participate in individual counseling, demonstrate effective parenting skills, obtain and maintain employment and suitable housing, refrain from drug or alcohol use, take random drug tests, and meet with a psychiatrist for medication management.

Mother completed several of the Department's requirements. When mother was released from jail, she did not have housing or employment. She did some "odd end jobs," but did not have a steady job. However, she completed a parenting class on August 25, 2016 and attended individual therapy. In addition, mother participated in a parenting and psychological assessment, and a report was completed on September 9, 2016. After testing and interviewing mother, the psychologist determined that mother had a "high lifetime probability of a moderate to severe substance abuse disorder." The psychologist also found that mother is "an overly narcissistic or egocentric individual who is preoccupied with her own experience and her own needs and feelings. Her excessive self-focus limits the attention she can give to the needs and feelings of others including her children." The psychologist was concerned that without counseling, mother's "lack of stress and frustration tolerance may make it difficult for her to endure and respond adaptively to the kinds of demands growing children make on a parent." As requested, mother also went to a psychiatrist, but no medicines were recommended.

---

with her, so the Department requested a home study. The Caroline County Department of Social Services conducted the home study and recommended that the paternal grandmother's home not be a suitable placement for the children.

Once the Department removed the children from the parents' care, neither father nor mother had any face-to-face visits with the children. Mother testified that she had not seen the children since September 2, 2015. However, mother admitted that she "stayed away" from the children for many months because she was angry with father. In June 2016, mother told the Department that she would like to speak with the children, but she did "not know what she would say or how to deal with their emotions." It was not until October 2016 that mother indicated that she was ready to talk with the children, and in December 2016, mother had one telephone call with the children. Mother and the children exchanged letters, until February 28, 2017, when the Department told her that she could no longer write letters to the children. Mother brought "an overabundance of presents" to the children, so the Department spoke with her about the gifts not being substantive or having meaning and thereafter, "she gave gifts more appropriately."

Mother did not present any plans to the Department about how she would provide for the children if she were to have custody of them. At the time of the JDR court termination hearing, mother stated that if the children were returned to her custody, her plan was to work part-time, "sleep only four hours a night," and care for the children the remainder of the time. On February 28, 2017, the JDR court terminated mother's parental rights to the children pursuant to Code § 16.1-283(C)(2). Mother appealed to the circuit court.[5]

On July 31 and October 10, 2017, the parties appeared before the circuit court. At the July 31, 2017 hearing, the Department expressed doubt about mother's ability to parent the children. The Department was concerned about mother reporting to the social worker that she and father had a history of domestic violence and that mother had a history of substance abuse. The Department noted that mother "still has a lot of work to do on herself based on anxiety and coordinating her own

---

[5] The JDR court also terminated father's parental rights to the children pursuant to Code § 16.1-283(C)(2). Father appealed to the circuit court.

- 5 -

treatment." In addition, mother did not have a job and had not shown that she could provide financially for the children. Mother also did not have a plan for dealing with the children's special needs and taking them to their necessary appointments. The Department explained that each of the children participated in counseling, ranging from ten hours per week to twice per month. In addition, two of the children had required occupational therapy. One child also received therapeutic day treatment at school, camp services during the summer, and psychiatric services. Another child required special education services at school and therapeutic aides. A third child had an appointment for a neurological evaluation because the child's foster parents were concerned that the child had processing issues. The Department was concerned that father and mother did not "seem to have their own situations managed, let alone being able to add five children to that successfully."

At trial, mother argued that she had improved her situation since September 2015. She testified that she participated in a weekly support group meeting and group therapy and individual therapy at the VA hospital. She also submitted to random drug screens. She introduced into evidence a letter from the VA hospital stating that she had been active in the suboxone maintenance program since April 2017.

After the JDR court termination hearing, mother and father started living together again, and attending counseling with a pastor. Mother explained that she intended to be a stay-at-home parent and not work. She still did not have a driver's license. Mother testified that father planned to continue to support them financially, even if his parental rights were terminated and mother's parental rights were not terminated. Mother and father had no plans to get a divorce, even if one parent's parental rights were terminated.

Furthermore, at trial, mother admitted that she was "a compulsive liar" and "said whatever [she] had to say to get [her] children." She acknowledged that she may have said things to the guardian *ad litem* that were not true.

The parties submitted their closing arguments in writing. On December 14, 2017, the circuit court issued its letter opinion and terminated mother's parental rights pursuant to Code § 16.1-283(C)(1) and (2).[6] On January 9, 2018, the circuit court entered an order reflecting its rulings. Mother filed a motion to reconsider, which the circuit court denied. This appeal followed.

ANALYSIS

"Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Fauquier Cty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 190, 717 S.E.2d 811, 814 (2011) (quoting Martin v. Pittsylvania Cty. Dep't of Soc. Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986)). "When considering termination of parental rights, 'the paramount consideration of a trial court is the child's best interests.'" Id. (quoting Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991)).

Mother argues that the circuit court erred in terminating her parental rights pursuant to Code § 16.1-283(C)(1) and (C)(2) and that it was in the children's best interests to terminate her parental rights. She emphasizes that the children were in father's care when they were removed and that she substantially complied with the Department's requirements.

A court may terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the

---

[6] The circuit court also sustained the Department's motion for summary judgment and terminated father's parental rights pursuant to Code § 16.1-283(E)(iii). Father appealed the circuit court's ruling to this Court. See J. King v. King George Dep't of Soc. Servs., Record No. 0164-18-2.

reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Code § 16.1-283(C)(2).

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271, 616 S.E.2d 765, 772 (2005). "Considerably more 'retrospective in nature,' subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he has been offered rehabilitation services." Id. (quoting City of Newport News Dep't of Soc. Servs. v. Winslow, 40 Va. App. 556, 562-63, 580 S.E.2d 463, 466 (2003)).

Here, the Department removed the children from the parents' custody in March 2016 pursuant to a CHINS petition filed by the guardian *ad litem*. Mother previously had been removed from the home in September 2015 due to father obtaining a protective order against her. Even though mother was no longer prohibited from having contact with the children after the dismissal of the protective order, she did not try to contact them for months because of her anger toward father. Her actions support the psychologist's conclusion that mother's "excessive self-focus limits the attention she can give to the needs and feelings of others including her children."

Then, mother was incarcerated from February through April 2016 for driving under the influence and possession of a scheduled narcotic drug. At the CHINS hearing, mother admitted that foster care was the best option for the children. Mother was incarcerated at the time and unable to assume custody of the children. While the children were in foster care, mother did not demonstrate that she had the capability of caring for the children. She did not have stable housing until she resumed living with father on February 28, 2017. She did not have a job and

intended to rely on father to meet her and the children's financial needs. She did not have a driver's license.

The circuit court found that mother was "chronically tense, anxious, and depressed, a self-confessed compulsive liar who is likely to have a moderate to severe substance abuse disorder the remainder of her life." The circuit court held that mother had "no workable plan to have physical custody of her children . . . . Her only stated plan was to sleep four hours per day, work part-time and be the sole provider and sole caretaker of her five children. She has no job."

Although mother was not in the home when the Department removed the children, she did not substantially remedy the conditions that led to the children's continued placement in foster care. Mother was not able to provide financially for the children, and testified that she intended to rely on father to provide their necessities. The psychologist opined that mother "lacks self-esteem and confidence in her ability to function independently, and consequently, she tends to seek out dependency relationships . . . ." The children had special needs and numerous therapy and medical appointments, but mother did not have a valid driver's license and relied on others for transportation. Furthermore, mother had a history of substance abuse, and although she was in remission and counseling, mother had a "high lifetime probability of a moderate to severe substance use disorder."

Contrary to mother's arguments, she had not remedied the conditions that required the children to remain in foster care. At the time of the circuit court hearing, the children had been in foster care for approximately sixteen months. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Tackett v. Arlington Cty. Dep't of Human Servs., 62 Va. App. 296, 322, 746 S.E.2d 509, 522 (2013) (quoting Kaywood v. Halifax Cty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990)). Accordingly, the circuit court did

- 9 -

not err in terminating mother's parental rights pursuant to Code § 16.1-283(C)(2) and finding that the termination was in the best interests of the children.

"When a trial court's judgment is made on alternative grounds, we need only consider whether any one of the alternatives is sufficient to sustain the judgment of the trial court, and if so, we need not address the other grounds." Kilby v. Culpeper Cty. Dep't of Soc. Servs., 55 Va. App. 106, 108 n.1, 684 S.E.2d 219, 220 n.1 (2009); see also Fields v. Dinwiddie Cty. Dep't of Soc. Servs., 46 Va. App. 1, 8, 614 S.E.2d 656, 659 (2005) (the Court affirmed termination of parental rights under one subsection of Code § 16.1-283 and did not need to address termination of parental rights pursuant to another subsection). Therefore, we will not consider whether the circuit court erred in terminating mother's parental rights pursuant to Code § 16.1-283(C)(1).

## CONCLUSION

For the foregoing reasons, the circuit court's ruling is summarily affirmed. Rule 5A:27.

Affirmed.