COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker, Judges Humphreys and O'Brien

KIARA RANDOLPH

                                                    MEMORANDUM OPINION*
v.       Record No. 1144-18-3                       PER CURIAM
                                                    FEBRUARY 12, 2019
ROANOKE COUNTY DEPARTMENT
 OF SOCIAL SERVICES

          FROM THE CIRCUIT COURT OF THE CITY OF SALEM
                    William D. Broadhurst, Judge

          (Diana M. Perkinson; Perkinson Law Office, on brief), for appellant.
          Appellant submitting on brief.

          (Rachel W. Lower, Assistant City Attorney; Shannon L. Jones,
          Guardian *ad litem* for the minor children, on brief), for appellee.
          Appellee and Guardian *ad litem* submitting on brief.


          Kiara Randolph (mother) appeals the circuit court's order terminating her parental rights to

her five children and approving the foster care goal of adoption. Mother argues that the circuit court

erred in finding that there was sufficient evidence to terminate her parental rights under Code

§ 16.1-283(C)(2). Upon reviewing the record and briefs of the parties, we conclude that the

circuit court did not err. Accordingly, we affirm the decision of the circuit court.

---

          * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

UNPUBLISHED

BACKGROUND[1]

"On appeal, 'we view the evidence and all reasonable inferences in the light most favorable to the prevailing party below, in this case the Department.'" Farrell v. Warren Cty. Dep't of Soc. Servs., 59 Va. App. 375, 386 (2012) (quoting Jenkins v. Winchester Dep't of Soc. Servs., 12 Va. App. 1178, 1180 (1991)).

Mother is the biological mother to five children, J.A.E., J.D.E., J.S.A.C., J.A.C., and J.T.[2] The Roanoke City Department of Social Services first became involved with the family in February 2012, and had conducted several family assessments through May 2014. On December 4, 2015, the Roanoke City Department of Social Services received a complaint that mother had given her older children adult allergy medication to calm them down and had shaken J.T. to stop him from crying. When the Child Protective Services (CPS) investigator arrived at the house on December 5, 2015, J.S.A.C., who was four years old at the time, opened the door and reported that there were no adults at home. In addition to J.S.A.C., there were four other children, all under the age of four years old, at the home alone. Amongst those five children were J.A.C., who was three years old, and J.T., who was one year old. The CPS investigator alerted the police and her supervisor. Approximately five to eight minutes later, mother and another woman arrived at the house and explained that they had gone to the bus stop to pick up their older children. They thought that the other woman's teenage brother was watching the children.

---

[1] The record in this case was sealed. Nevertheless, the appeal necessitates unsealing relevant portions of the record to resolve the issues raised by appellant. Evidence and factual findings below that are necessary to address the assignments of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." Levick v. MacDougall, 294 Va. 283, 288 n.1 (2017).

[2] We will refer to the minor children by their initials.

When the CPS investigator told mother about the purpose of her visit and the allegations against her, mother became very loud and started cursing. The CPS investigator entered into safety plans with mother and the other woman and placed the children with relatives. The police arrested mother and the other woman for five counts of contributing to the delinquency of a minor. The CPS investigator sought and obtained protective orders for the children. At the conclusion of the investigation, the matter was founded as a "level one for inaccurate supervision." The Roanoke City Department of Social Services transferred the case to Roanoke County Department of Social Services (the Department) after mother moved to Salem.

When the Department first became involved with the family, the children were "very overwhelmed" and "stressed." J.A.E., who was seven years old, needed a physical and immunizations and assisted "quite a bit" with the care for the younger children. J.D.E., who was six years old, was "extremely aggressive" and urinated in the closet and beds. J.S.A.C., who was almost five years old, was diagnosed with sickle cell anemia, a heart murmur, and a kidney condition. J.S.A.C. required penicillin twice per day, but had been without penicillin for four months when the Department first became involved with the family. He also had missed several medical appointments at the University of Virginia. J.A.C., who was four years old, was "very withdrawn" and aggressive. J.T., who was one year old, frequently cried and was a "very fussy, unsettled baby."

The Department offered ongoing services from January 12, 2016 through August 15, 2016. Mother completed a parenting class, but otherwise, was "extremely resistant" to the services. The Department provided CHIP services, which helped to coordinate medical care for the children. The Department referred mother for mental health treatment and medication management because she had been diagnosed with paranoid schizophrenia and bipolar disorder.

Mother, however, was noncompliant with her medication. The Department referred mother to a mental health skill builder, with whom she was somewhat compliant with her appointments.

Mother's finances were an issue that impacted the children's basic needs, including housing and food. The Department offered mother financial assistance and budgeting assistance to address the problems. Mother, however, refused to share her financial information. Mother had difficulty with maintaining housing, despite her disability income, J.S.A.C.'s disability income, temporary aid to needy families (TANF) from the Department, and child support. Mother had food stamps, but was unable to provide enough food for the family. The Department referred her to WIC, which is another food service offered through the Health Department, but mother declined the service because it was "too much trouble." The Department paid for some food and referred her to the Salem Food Pantry.

The Department also offered family support services to help with parenting, housekeeping, skill building, scheduling appointments, time management, employment and job readiness, transportation assistance, finding support, and finding child care. The Department paid for the children to attend summer camp and transported them to the summer camp. The Department also provided the children with bathing suits and gave mother gift cards to purchase snacks for the children at camp. In addition, the Department purchased two twin mattresses and bed frames, and it paid the electric bill and one month's rent. Despite all of this assistance, mother was still three months behind in her rent and other bills.

By August 2016, mother faced eviction, and the condition of the home had deteriorated. Mother refused to allow the Department to confirm her medication management, but the Department learned that she had missed appointments with her counselor and psychiatrist. Mother refused to allow the Department to assist her with budgeting and would not explain to the Department where her funds were spent. The Department was concerned that mother continued

to leave the children with inappropriate caregivers, and the Department noticed that the children's hygiene had deteriorated. On August 15, 2016, the Department met with the mother to discuss its concerns and asked her to take a drug test, which she refused. However, she admitted that she would test positive for marijuana and possibly something else. At that point, there were no options for relative placement, so the Department removed the children and placed them in foster care.

On August 16, 2016, the Salem Juvenile and Domestic Relations District Court (the JDR court) entered emergency removal orders. On August 22, 2016, the JDR court entered preliminary removal orders and adjudicated that the children were abused or neglected. On October 3, 2016, the JDR court entered the dispositional orders.

Once the children were in foster care, the Department learned that several of the children had medical and dental needs. J.A.C. needed dental work because two teeth were decaying and needed crowns. J.S.A.C. needed penicillin. J.T. had an ear infection and ringworm.

The Department reviewed with mother the steps she would have to take for the children to return home. The Department required mother to maintain contact with her social worker and provide updates of any changes in her address or phone number, obtain and maintain suitable housing, comply with her medication, maintain her appointments, cooperate with service providers, participate in counseling, participate in visitation, participate in a parental capacity evaluation, submit to random drug screens, and participate in family partnership meetings. Mother struggled even with maintaining contact with the Department, as her phone number frequently changed. Mother was evicted in August 2016 and did not obtain housing until April 2017. In December 2017, she faced eviction again for non-payment of rent. She did not participate in weekly counseling, as required, and lost her mental health skill building services due to noncompliance. Mother was "extremely defensive" about her medications and refused to

show them to the Department; thus, the Department was unable to verify that she complied with her medication. Mother submitted to random drug tests as requested, and she tested positive for marijuana and cocaine on May 15, 2017 and June 12, 2017. On December 1, 2017, mother submitted to another drug test, which was negative.

The Department provided weekly visitation until the JDR court terminated mother's parental rights, and then reduced visitation to once per month. Mother was very consistent with her visitation.

The Department referred mother for a parental capacity evaluation, which Dr. Jeannie Berger conducted in November 2016. Dr. Berger identified several barriers to mother's effective parenting, especially her mental health issues and the children's special needs. Dr. Berger explained that mother's diagnosis of paranoid schizophrenia and bipolar disorder were the "most severe and challenging disorders" and presented a "phenomenal barrier" to effective parenting. Dr. Berger "could not find strong evidence that [mother] was complaint with her medication treatment," which was very concerning to her because compliance with medication was "of the upmost importance." Furthermore, Dr. Berger opined that "[n]ot being in treatment and dealing with those [mental health disorders] on your own is also almost insurmountable in terms of being an effective parent . . . ." Dr. Berger also was concerned that mother was abusing illegal drugs because marijuana use could increase her paranoia and cocaine use or withdrawal could mimic manic episodes. Consequently, Dr. Berger did not recommend that the children be returned to mother's care.

On June 14, 2017, the JDR court entered orders terminating mother's parental rights and approving the foster care goal of adoption for each child.[3] Mother appealed to the circuit court.

---

[3] The JDR court also terminated the fathers' parental rights, and they appealed to the circuit court, which terminated their parental rights.

On January 5, 2018, the parties appeared before the circuit court. Mother still had unstable housing and insecure finances. The Department could not confirm whether mother was compliant with her medication or counseling because she did not notify them of her situation. The social worker testified that mother was struggling to her meet her own needs and was not able to meet the children's needs.

At the hearing, the Department also provided an update on the children. J.A.E., who was in a prospective adoptive home, still had issues with stealing, anxiety, and anger; consequently, she went to weekly counseling and took medication for depression. J.A.E.'s counselor opined that she was making "some progress" and starting to trust and discuss her feelings. J.D.E. was still "extremely defiant" and took several medications for his mood and ADHD. He received in-home services and saw a psychiatrist. His counselor testified that he "struggles on a daily basis in making safe choices and decisions." She opined that he needed a "structured and therapeutic" home, where the parents would be consistent. Although J.D.E. was not in a prospective adoptive home, the Department had located a potential adoptive home for him. J.S.A.C., who also was not in a prospective adoptive home, suffered a sickle cell attack a few days before the circuit court hearing, and as a result, went to the emergency room for treatment. J.S.A.C. was on numerous medications and required parents who could manage his health situation. He also attended counseling and struggled academically. J.S.A.C.'s counselor testified that he was gradually progressing and needed a home that provided structure and boundaries, as well as with parents who could address his physical needs. J.A.C., who was in a prospective adoptive home, attended therapy and struggled with behavioral issues at school. J.A.C. was prescribed medication for his aggression. J.A.C.'s counselor opined that he was progressing and doing "really well." His counselor testified that he was in a "really good placement" and needed permanency. J.A.C. also was diagnosed with a heart murmur, which

required monitoring. J.T. was in a prospective adoptive home, where he was doing very well. Due to some behavioral issues, J.T. had been referred to play therapy.

Mother testified about her current living and employment situations. She explained that she had been living in a three-bedroom apartment since April 2017. She admitted that the landlord had filed a lawsuit against her for rent owed, but mother testified that she paid the back rent through November 2017. She acknowledged that she still owed money for December rent and late fees. Mother testified that on May 31, 2017, she started working at a job through a staffing agency, but her assignment with that agency ended December 13, 2017. When the staffing agency was unable to place her immediately in another job, she applied for other jobs through two different staffing agencies. She expected to start a new job with a different agency after the circuit court hearing.

Mother testified that she had been seeing a psychiatrist for medication for her mental health issues. She claimed that at their last appointment in October 2017, the psychiatrist stopped her medication because she was doing better. When asked if mother had proof that the doctor took her off of her medication, mother admitted that she did not have a letter. As of the circuit court hearing, she was seeing her counselor every two weeks, but admitted that she did not have an updated letter from her counselor with her recent appointments. She acknowledged that she had not always taken her medication in the past and had missed some of her appointments for medication management.

After hearing all of the evidence and arguments, the circuit court terminated mother's parental rights and approved the goal of adoption. On June 19, 2018, the circuit court entered the order memorializing its ruling. This appeal followed.

ANALYSIS

Mother argues that the evidence was insufficient to terminate her parental rights under Code § 16.1-283(C)(2). Mother asserts that she had substantially remedied the conditions that led to her children being placed in foster care.

"On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Castillo v. Loudoun Cty. Dep't of Family Servs., 68 Va. App. 547, 558 (2018) (quoting Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Fauquier Cty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 190 (2011) (quoting Martin v. Pittsylvania Cty. Dep't of Soc. Servs., 3 Va. App. 15, 20 (1986)).

The circuit court terminated mother's parental rights under Code § 16.1-283(C)(2), which provides that a court may terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271 (2005).

The Roanoke City Department of Social Services had been offering mother and the family services since 2012. The Department became involved with the family in early 2016 and

offered numerous services. Despite those services, mother was unable to remedy substantially the conditions that led to the children being placed, and remaining, in foster care. The Department required mother to maintain stable housing and be financially stable. Mother was evicted from her apartment shortly after the Department placed the children in foster care. In April 2017, she obtained a new apartment, but by December 2017, she again faced eviction because she was behind on her rent payments. The Department offered to assist mother with budgeting, but she refused to provide her social worker with a budget. When the circuit court asked why she never produced a budget as requested, she said that she did not know. Despite mother's efforts, she remained financially unstable.

In addition, mother's medication management had been a concern since the Department first became involved with the family. Mother testified that as of the circuit court hearing, she was regularly seeing her counselor and that her psychiatrist had determined that she no longer needed her medication. However, mother did not provide any documentation to support her testimony about her current mental health status. When questioned by the circuit court, she admitted that she previously had missed some appointments regarding her medication and sometimes forgot to take her medicine.

The circuit court found that mother had "made steps" and recognized that mother wanted to parent her children; however, the circuit court also found that mother had "significant" mental health issues and was not compliant with her medication. The circuit court held that even if she had more time, mother would be unable to "equip herself to maintain the burden of caring for these children, all of whom [have] . . . special needs." Credible evidence supports the circuit court's conclusion. Dr. Berger opined that mother's instability, her mental health issues, and the children's special needs were barriers to her effective parenting. In addition, the children's counselors all stressed the children's need for structure. Mother's uncertain housing and

unstable employment over a prolonged period made it unlikely that she would be able to provide the necessary stability and structure for the children. Furthermore, mother's inability to comply with her medications caused concern over whether she could manage the children's medication, especially since the Department presented evidence that J.S.A.C. had not received his required medication for four months prior to the Department's involvement. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Tackett v. Arlington Cty. Dep't of Human Servs., 62 Va. App. 296, 322 (2013) (quoting Kaywood v. Halifax Cty. Dep't of Soc. Servs., 10 Va. App. 535, 540 (1990)).

Based on the totality of the circumstances, the circuit court did not err in terminating mother's parental rights under Code § 16.1-283(C)(2).

## CONCLUSION

For the foregoing reasons, the circuit court's ruling is affirmed.

Affirmed.