UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Judges Russell, AtLee and Senior Judge Haley

MARY ANN COOPER

                                                            MEMORANDUM OPINION[*]

v.      Record No. 0057-21-3                                 PER CURIAM
                                                       AUGUST 10, 2021

BRISTOL VIRGINIA DEPARTMENT
 OF SOCIAL SERVICES

FROM THE CIRCUIT COURT OF THE CITY OF BRISTOL
Sage B. Johnson, Judge

(David Eddy, on brief), for appellant.

(Matthew B. Crum; Mark D. Haugh, Guardian *ad litem* for the minor
child, on brief), for appellee.

Mary Ann Cooper (mother) appeals the circuit court's order approving the foster care goal

of adoption. Mother argues that the circuit court erred in approving the foster care plan, finding that

it was in the best interests of the child, and finding that the Bristol Virginia Department of Social

Services (the Department) had provided "reasonable and necessary efforts or services" to her. Upon

reviewing the record and briefs of the parties, we conclude that this appeal is without merit.

Accordingly, we summarily affirm the decision of the circuit court. See Rule 5A:27.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND[1]

On appeal, "we view the evidence in the light most favorable to the prevailing party, in this case, the Department, and grant to it all reasonable inferences fairly deducible from the evidence." King v. King George Dep't of Soc. Servs., 69 Va. App. 206, 210 (2018) (quoting C. Farrell v. Warren Cnty. Dep't of Soc. Servs., 59 Va. App. 375, 420-21 (2012)).

Mother is the biological mother of two children, D.C. and J.C., but only J.C. is the subject of this appeal. On January 31, 2018, the Department received a call concerning D.C. and the family. During its investigation, the Department became concerned over allegations of abuse and mother's substance abuse. On February 1, 2018, the Department removed then-ten-month-old J.C. from mother's care.[2]

The City of Bristol Juvenile and Domestic Relations District Court (the JDR court) entered emergency and preliminary removal orders. The JDR court adjudicated that J.C. was abused or neglected and subsequently entered a dispositional order approving a goal of return home.

After the removal of J.C., the Department and foster mother noticed that J.C. had "noticeable delays in his language and social/emotional skills" and exhibited "social stimming behaviors." The Department referred J.C. to physical, speech, and occupational therapy to address his speech and developmental delays. J.C. functioned "several months below his actual

---

[1] The record in this case was sealed. Nevertheless, the appeal necessitates unsealing relevant portions of the record to resolve the issues appellant has raised. Evidence and factual findings below that are necessary to address the assignments of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." Levick v. MacDougall, 294 Va. 283, 288 n.1 (2017).

[2] The Department also removed then-ten-year-old D.C. Mother later regained custody of D.C. after the entry of a protective order.

age in all areas (gross motor, fine motor, cognitive, language, self-help and social emotional)." He also had "tongue-tie," which was clipped while he was in foster care. In addition, J.C. had problems with aspiration and swallowing.

The Department reviewed with mother the requirements she had to meet to be reunified with J.C. The Department required mother to obtain and maintain safe and stable housing because when J.C. was removed from her care, mother was "staying back and forth with friends . . . and family." In March 2018, mother obtained an apartment. The Department also required mother to show that she was financially stable, which she did once she was approved to receive social security. In addition, the Department required mother to submit to random drug screens and participate in substance abuse treatment. From July 20, 2018 to September 26, 2018, mother was incarcerated for a drug offense. When mother was released from jail, she tested negative at her drug screens and attended substance abuse treatment classes. Furthermore, the Department referred mother to parenting classes and counseling, in which she participated.

Initially, the Department offered weekly supervised visitations to mother. Mother participated in five visits before the Department received a letter from J.C.'s pediatrician recommending that the visits stop. J.C.'s pediatrician explained that J.C. was "regressing instead of progressing with his self-stimulating and developmental issues." In June 2018, J.C.'s pediatrician advised the Department that she did "not believe reinstating these visitations EVER . . . [would] be in the child's best interests." The Department suspended the visits, and the foster mother testified that after visitation with mother stopped, J.C. did not exhibit any "stimming, humping or head banging behaviors."

Despite the lack of visitation, mother "frequently" called the Department to inquire about J.C. and his well-being. The Department provided mother with intensive in-home services and parent coaching. In addition, J.C. began therapy with a therapist who was a certified trauma

specialist. The therapist worked with J.C. on his anxiety, food obsession, emotional regulation, oppositional behaviors, and sleep issues. The therapist testified that over the course of treatment, J.C. had improved, especially with his anxiety, speech, and sensory issues.

Once mother and J.C. were stable, the Department offered mother another opportunity to visit J.C. On March 28, 2019, mother visited with J.C. The Department reported that the visit was "unremarkable"; however, after the visit, "all of [J.C.'s] behaviors that had abated returned immediately." J.C.'s pediatrician informed the Department that J.C.'s "behaviors will continue to start every time you introduce someone from his past." J.C.'s therapist agreed that J.C. should not visit with mother because of the "threat of regression" and the emotional and physical dangers to him. J.C.'s therapist suggested that mother "participate in some form of therapy that's going to help educate her [about her role in J.C.'s removal], and work on her own individual needs."

Considering J.C.'s reaction to the visit and the professionals' recommendations, the JDR court entered an order prohibiting mother from visiting J.C., yet the Department continued to work toward a goal of return home. The JDR court subsequently disapproved the foster care plan with the goal of return home and directed the Department to submit a new plan. After the JDR court's ruling, the Department requested assistance from a licensed clinical social worker, who also was a certified trauma specialist. The therapist reviewed the records and met with mother to work toward visitation. The therapist emphasized that mother needed to gain "the insight into what had transpired, and . . . accept any accountability for what had happened and that her son was in the position that he was in." After six sessions, mother stopped attending counseling and contacting the therapist. The therapist testified that mother had not accepted any responsibility for her actions and continued to blame the Department for taking J.C. Mother

explained that she was "already in therapy" with a different provider and "didn't see the point" in meeting with the Department's therapist.

The Department submitted a new foster care plan with the goal of adoption, which the JDR court approved on July 25, 2019. Both the Department and mother appealed the JDR court's rulings.[3]

Before the circuit court hearing, mother met with Dr. Steven Lawhon, a licensed clinical psychologist, who performed a psychological evaluation and parenting assessment. Dr. Lawhon also evaluated J.C. Dr. Lawhon found J.C. to be "very hyperactive" and "clearly developmentally delayed." Dr. Lawhon opined that someone, other than mother, had sexually and/or physically abused J.C. when he was between the ages of six months and ten months old.[4]

Although Dr. Lawhon believed that mother clearly loved J.C., he stressed that she needed "a lot of guidance and education and help" to become a "good parent." Dr. Lawhon recommended that mother "complete a course of treatment with an individual therapist" that focused on parenting skills, anxiety, substance abuse, and "acceptance of personal responsibility for unhealthy lifestyle choices." Recognizing others' stated concerns, Dr. Lawhon nevertheless would support another attempt at reunification, provided that mother participated in individual therapy and accepted responsibility "for the bad men in her life, for the drugs that she did and all those sort of things." Dr. Lawhon opined that mother had the "potential" to be able to reunite with J.C., but she would likely need a year in therapy.

On October 8, 2020, the parties appeared before the circuit court. The Department reported that J.C. had had "a lot of behavioral challenges, a lot of attachment issues . . . [and a]

---

[3] The Department subsequently withdrew its appeal.

[4] Dr. Lawhon testified that J.C.'s self-stimulation behavior was related to sexual abuse.

lot of aggression . . . ." He had been with the same foster family since shortly after his removal. The foster mother testified that J.C. required "constant supervision, because he has a decreased attention span and he has impulsive behaviors." J.C. had been sick "numerous times" with pneumonia and asthma. J.C.'s aspiration issues remained a daily concern. J.C. had frequent appointments with doctors and therapists to address his special needs.[5]

The Department reported that it had concluded that adoption was the most appropriate goal for J.C. The Department remained concerned about mother's ability to address all of J.C.'s "significant needs." Although mother had complied with the Department's required services, she had not accepted responsibility for J.C. being in foster care. Moreover, J.C. "just emotionally cannot handle" reunification.

Mother emphasized that she had completed all the Department's requirements, including parenting classes and a parenting assessment. She testified that a month after the Department removed J.C., she had found a home, which she had maintained throughout the case. Mother received social security. She had not been involved in any relationships since the child's removal. Mother had access to transportation and was available to take J.C. to his appointments.

Mother testified that she had been in therapy with a licensed clinical social worker since J.C.'s removal. She explained that her therapist provided substance abuse treatment, and while acknowledging that she had used illegal drugs before J.C.'s removal, mother testified that she had not used any illegal drugs since before March of 2018. All mother's drug screens had been negative. Mother's therapist also worked with her on parenting skills.

Mother was frustrated that she had not been able to see J.C. based on "a recommendation of a pediatrician." Mother testified that she had tried to contact J.C.'s pediatrician, but the doctor

---

[5] The foster mother testified that J.C. had had 342 appointments between February 2018 and September 2020.

would not speak with her. Mother explained that she "never did anything to [J.C.]" and had "never hurt him." Mother testified that after J.C.'s birth, she took J.C. to the pediatrician regularly and a CHIP worker and nurse also visited their home to check on the family. At the time, J.C. was meeting his childhood milestones. Mother testified that she "just want[ed] to hold [J.C.]" and argued against the foster care goal of adoption.

After hearing the evidence and arguments, the circuit court found, by a preponderance of the evidence, that the Department had met its burden of proof to support changing the foster care goal from return home to adoption. The circuit court also found that the Department had "made reasonable efforts to accommodate that change of goal and to accommodate [mother] in that change of goal, and that those efforts have been unsuccessful . . . ." The circuit court subsequently entered an order approving the permanency planning goal and remanding the case to the JDR court for further hearings. This appeal followed.

ANALYSIS

Mother challenges the circuit court's approval of the foster care goal of adoption. "A preponderance-of-the-evidence standard governs judicial review of the foster care plan recommendations . . . ." Boatright v. Wise Cnty. Dep't of Soc. Servs., 64 Va. App. 71, 79 (2014) (quoting Najera v. Chesapeake Div. of Soc. Servs., 48 Va. App. 237, 240 (2006)). "On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Castillo v. Loudoun Cnty. Dep't of Fam. Servs., 68 Va. App. 547, 558 (2018) (quoting Logan v. Fairfax Cnty. Dep't of Hum. Dev., 13 Va. App. 123, 128 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Fauquier Cnty. Dep't of Soc. Servs. v.

Ridgeway, 59 Va. App. 185, 190 (2011) (quoting Martin v. Pittsylvania Cnty. Dep't of Soc. Servs., 3 Va. App. 15, 20 (1986)).

Mother argues that the circuit court erred in finding that there was sufficient evidence to support a change in the foster care goal. Mother contends that the Department did not provide her with the "necessary services" to promote reunification because it limited her visitation with J.C. "'Reasonable and appropriate' efforts can only be judged with reference to the circumstances of a particular case. Thus, a court must determine what constitutes reasonable and appropriate efforts given the facts before the court." Harrison v. Tazewell Cnty. Dep't of Soc. Servs., 42 Va. App. 149, 163 (2004) (quoting Ferguson v. Stafford Cnty. Dep't of Soc. Servs., 14 Va. App. 333, 338 (1992)).

Here, the evidence proved that the Department provided mother with visitation in March 2019, notwithstanding that the experts recommended against doing so. Then, despite the reports that J.C.'s behaviors had regressed after that visit, the Department continued to work with mother on reunification and enlisted the assistance of a trauma specialist to review the record and counsel mother. The circuit court found that the Department "was committed to reunification," but mother had stopped attending the sessions with the trauma specialist.

The circuit court found that J.C. is "a very complicated young boy with an incredible amount of needs, both physical, emotional, psychological." The record includes detailed information about J.C.'s special needs, as well as mother's progress and compliance with the Department's requirements. Nevertheless, the record also supports the circuit court's finding that mother had a "lack of understanding about what led to the traumatization" and did not accept responsibility for J.C.'s trauma. The circuit court noted that even mother's expert, Dr. Lawhon, determined that mother lacked an understanding of her role in J.C.'s circumstances. The evidence suggested that J.C. had been sexually abused, albeit not by mother, between the ages of

six months and ten months, while he was in her care.  Furthermore, mother's refusal to accept responsibility hindered any efforts for reunification.

At the time of the circuit court hearing, J.C. had been in foster care for most of his life. The circuit court noted that while "981 [days in foster care] is an unusually long period of time[,] . . . it's not the end all and be all of it."  After hearing all the evidence, though, the circuit court concluded that mother still was "not ready" to care for J.C.  "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities."  Tackett v. Arlington Cnty. Dep't of Hum. Servs., 62 Va. App. 296, 322 (2013) (quoting Kaywood v. Halifax Cnty. Dep't of Soc. Servs., 10 Va. App. 535, 540 (1990)).

Based on the totality of the record, the circuit court did not err in changing the foster care goal and finding that a goal of adoption was in the child's best interests.

## CONCLUSION

For the foregoing reasons, the circuit court's ruling is summarily affirmed.  Rule 5A:27.

Affirmed.