COURT OF APPEALS OF VIRGINIA

Present: Judges Fulton, Friedman and Raphael

AMANDA HOPE MILLER

v.     Record No. 0761-22-3

WASHINGTON COUNTY DEPARTMENT
  OF SOCIAL SERVICES

MEMORANDUM OPINION* BY
JUDGE STUART A. RAPHAEL
MAY 16, 2023

FROM THE CIRCUIT COURT OF WASHINGTON COUNTY
Fredrick A. Rowlett, Judge

(M. Kathryn Maybury, on brief), for appellant. Appellant
submitting on brief.

(Matthew B. Crum; Jordan C. Pennington, Guardian ad litem for the
minor children, on brief), for appellee. Appellee and Guardian ad
litem submitting on brief.

Amanda Hope Miller ("mother") appeals the order entered by the circuit court finding

"by a preponderance of the evidence that the foster care goal of adoption . . . [was] appropriate

and in the best interest of [mother's] minor children." She argues that the circuit court erred

because the Washington County Department of Social Services ("Department") failed to prove

that the goal was in the best interest of the children. Mother also contends that the Department

did not make reasonable efforts to reunite her with her children. Finding no error, we affirm the

judgment below.

---

* This opinion is not designated for publication. *See* Code § 17.1-413.

BACKGROUND[1]

On appeal, "we view the evidence in the light most favorable to the prevailing party, in this case, the Department, and grant to it all reasonable inferences fairly deducible from the evidence." *King v. King George Dep't of Soc. Servs.*, 69 Va. App. 206, 210 (2018) (quoting *Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 375, 420-21 (2012)).

Mother and Justin Miller ("father") are the biological parents of C.M., E.M., and L.M., who were ages six, five, and one, respectively, at the time of their initial removal from their parents' home. The Department had received a report detailing the family's homelessness and alleging mental abuse and domestic violence. Before removing the children, the Department "had short term involvements with the Miller family on and off, for concerns of the family's ability to provide necessities." The children were not in school, had "issues of basic hygiene," and "had a lot of food insecurity."

The Washington County Juvenile and Domestic Relations District Court ("JDR court") conducted an adjudicatory hearing, during which both mother and father "stipulated that the Department would be able to find sufficient evidence to prove neglect." The JDR court also noted removal was necessary because mother had signed a temporary entrustment agreement at the Department's request. The Department implemented safety plans, and the children were removed to foster care with the goal that they would eventually return home or be placed with a family member.

Following the children's removal, mother and father separated and began divorce proceedings. Father "was largely not involved" in efforts to reunite the children with their

---

[1] The record in this case is sealed. Nevertheless, this appeal necessitates unsealing limited portions, including factual findings. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017).

parents. But mother "was very amenable." The Department helped her, for example, by referring her for homemaker services, a parenting assessment, and parenting classes. It also assisted her with medical services and provided financial assistance to help meet the children's needs and establish housing. But the Department was concerned that mother would be overwhelmed if all the children were returned to her at once.

The Department coordinated and supervised visitations with mother and the children for one hour a week. It also provided mother with transportation when needed. Mother was later permitted to participate in unsupervised visits with the children, and eventually, the Department reunited L.M. and mother for a trial home placement. The other children came for weekend visitations until several months later, when the Department reunited them with mother for trial home placements as well. Mother was aware that, under the safety plan, father would not be allowed in the home, as the children were afraid of their father and had been neglected and emotionally abused by him.

The Department soon received a report that the police were called to mother's apartment for an incident involving father. Father was present in the apartment "with an unknown woman and they were engaging in inappropriate behavior in front of the children." The Department interviewed mother about the incident, but she denied father was in the home. The Department also interviewed the children. E.M. and L.M. stated that father, mother, and the unknown woman were involved in an argument and that the children felt scared. Mother later acknowledged that father and the unknown woman were in the home and that they had an argument. Mother admitted that she did not prevent father from entering the home and that she did not call the police to remove father from the home.

The Department decided to continue the trial home placement despite "concerns about the situation and leaving the [children] there." It discussed with mother "the importance of

honesty" and again instructed her not to allow father into the home and to call the police if it happened again. Not long after that, the Department received a report that father was again at mother's home. Mother denied that father was present, but the police found him "hiding in a closet with a dresser pulled in front of it." The police arrested father. Mother later admitted that she knew father was in the home and that she did not leave the home with the children or attempt to call the police. That event "left the children badly shaken." The Department removed the children and returned them to foster care.

The Department placed L.M. and E.M in the same foster home. At first, L.M. did well in foster care, but he soon became "defiant, frequently yelling and hitting the foster parents"— "different behavior than before the trial home placement." E.M. also struggled. He "expressed fearfulness" and anxiety about the possibility of returning to mother. He also exhibited behavioral issues and "act[ed] out" more than he did before the trial home placement. C.M. returned to the same foster home he was in before, and his foster parents expressed concern about the changes in his behavior and emotional state. C.M had developed issues with lying, stealing, and bullying. C.M. and E.M. began counseling and medication management.

Mother maintained suitable housing, and her health remained stable while the children were in foster care. She informed the Department she was seeking out counseling services and employment while waiting for her disability benefits to process. But a parenting assessment determined that mother would "struggle to be able to care for three children." The Department, too, remained concerned about mother's ability to meet her children's needs; she was dishonest with the Department about father's involvement with the children, and she had violated the safety plan when she allowed father to be in the home with them.

Following the trial home placement, the children also reported that mother had "behaved inappropriately" in a sexual manner with them. The Department's subsequent investigation

determined that the allegations were "unfounded . . . primarily because the [children] had suffered so much abuse and neglect throughout their lives that it was hard to pinpoint what was occurring, when it happened and by whom." Still, the Department concluded that the trial home placement had failed given the "additional allegations and concerns [that] ha[d] surfaced since the trial home placement ended."

C.M.'s therapist did not believe that returning C.M. to mother was the best course of action. C.M. was "often scared when with his mother because he [was] unsure if he [would] be safe from his past abusers." Similarly, E.M.'s therapist felt it would be "traumatic" for E.M. to be returned to mother.

As a result of those developments, the Department changed the foster care goal to adoption. The JDR court approved the new goal, and mother appealed to the circuit court.[2]

At the hearing before the circuit court, mother moved to strike at the close of the Department's evidence and again at the close of all evidence. She argued that the children had been in foster care for only 13 months at the time of the second removal and that she had rectified her housing and health issues that had required foster care in the first place. Mother asserted that she complied with the Department's instructions and was willing to abide by any restrictions regarding father. She asked the court to reject the Department's request to change the foster care goal to adoption.

The circuit court denied mother's motions to strike and approved the Department's request to change the permanency planning goal to adoption. It found that mother could not resume custody of the children because she was unable to protect them. The court was "not

_____

[2] Father did not appear at the proceedings related to the change to the foster care goal, and the JDR court determined that his whereabouts were unknown.

bound by the unfounded disposition of the most recent [Department] investigation" and cited the "very troubling comments" the children made about mother's behavior. Mother timely appealed.

ANALYSIS

On appeal, mother challenges the circuit court's denial of her motions to strike.[3] She argues that the circuit court erred in changing the permanency planning goal from return home/relative placement to adoption because adoption was not in the best interest of the children. Mother also contends that the Department did not make reasonable efforts to reunite her with her children.

"On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 558 (2018) (alteration in original) (quoting *Logan v. Fairfax Cnty. Dep't of Hum. Dev.*, 13 Va. App. 123, 128 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." *Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011) (quoting *Martin v. Pittsylvania Cnty. Dep't of Soc. Servs.*, 3 Va. App. 15, 20 (1986)). "A preponderance-of-the-evidence standard governs judicial review of the foster care plan recommendations." *Boatright v. Wise Cnty. Dep't of Soc. Servs.*, 64 Va. App. 71, 79 (2014) (quoting *Najera v. Chesapeake Div. of Soc. Servs.*, 48 Va. App. 237, 240 (2006)).

"When addressing matters concerning a child, . . . the paramount consideration of a trial court is the child's best interest." *Tackett v. Arlington Cnty. Dep't of Hum. Servs.*, 62 Va. App. 296, 328 (2013) (quoting *Logan*, 13 Va. App. at 128). And when reviewing a foster care plan, "[t]he court order shall state whether reasonable efforts, if applicable, have been made to reunite

---

[3] The parties waived oral argument.

the child with his parents." Code § 16.1-282(E). "'Reasonable and appropriate' efforts can only be judged with reference to the circumstances of a particular case. Thus, a court must determine what constitutes reasonable and appropriate efforts given the facts before the court." *Harrison v. Tazewell Cnty. Dep't of Soc. Servs.*, 42 Va. App. 149, 163 (2004) (quoting *Ferguson v. Stafford Cnty. Dep't of Soc. Servs.*, 14 Va. App. 333, 338-39 (1992)).

Here, the Department made reasonable efforts to reunite the children with mother. It referred mother to homemaker services and parenting classes. It offered financial assistance to establish housing and arranged for mother to complete a parenting assessment. The Department also organized visitation with the children, provided transportation, and arranged for a trial home placement. The children returned to foster care only after mother failed to comply with the safety plan.

The circuit court's conclusion that the permanency planning goal of adoption was in the children's best interest was not "plainly wrong or without evidence to support it." *Ridgeway*, 59 Va. App. at 190 (quoting *Martin*, 3 Va. App. at 20). Following the trial home placement, the children's behavior regressed. They reported that mother behaved inappropriately with them in a sexual manner, and their therapists testified that the children could be traumatized if they returned to live with her. Mother does not contest that the children were afraid of their father and had been neglected and emotionally abused by him. But during the trial home placement, she twice failed to comply with the Department's instructions to bar father from the home.

"It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." *Tackett*, 62 Va. App. at 322 (alteration in original) (quoting *Kaywood v. Halifax Cnty. Dep't of Soc. Servs.*, 10 Va. App. 535, 540 (1990)). At the time of the circuit court hearing, the children had been in foster care for almost 3 years, and it had been more than 18 months since the

- 7 -

Department removed the children from the trial home placement. After hearing the evidence, the circuit court reasonably found that mother was still unable to protect the children and was not prepared to resume custody.

CONCLUSION

The circuit court did not err when it approved the new permanency planning goal and found adoption to be in the children's best interest.

*Affirmed*.